[No. C046683. Third Dist. May 26, 2005.]

ART MADRID, Plaintiff and Appellant, v.
PEROT SYSTEMS CORPORATION et al., Defendants and Respondents.

442

444

---

## COUNSEL

Kiesel, Boucher & Larson, Ray Boucher, Michael C. Eyerly, Anthony M. De Marco; Aguirre & Meyer, Michael J. Aguirre; Dunn Koes, Pamela E. Dunn, Daniel J. Koes; Patricia A. Meyer & Assoc. and Patricia A. Meyer for Plaintiff and Appellant.

McDermott Will & Emery, Stephen A. Kroft, Richard J. Frey, Dan Chammas and Francisca M. Mok for Defendant and Respondent Perot Systems Corporation.

Farella Braun & Martel, C. Brandon Wisoff and Tyler C. Gerking for Defendant and Respondent California Independent System Operator.

Ruby & Schofield, Allen Ruby and Anne-Marie Waggoner for Defendant and Respondent Terry M. Winter.

Duane Morris, Joseph J. Aronica, Colin L. Pearce and Lina M. Brenner for Defendant and Respondent Paul Gribik.

## OPINION

**SIMS, J.**—Plaintiff Art Madrid seeks to pursue a class action lawsuit on behalf of California electricity customers, against parties involved in restructuring California's electricity market, who allegedly engaged in unlawful business practices in violation of the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.[1]). Plaintiff appeals from a judgment of dismissal following the sustaining of demurrers to his complaint against defendants Perot Systems Corporation (Perot), California Independent System Operator (ISO), Terry Winter (president and corporate executive officer of ISO), and Paul Gribik, a Perot associate. Plaintiff argues he alleged viable UCL claims. We disagree. As we shall explain, damages are not recoverable under the UCL, and plaintiff has alleged no viable theory upon which he could obtain restitution or injunctive relief. We shall therefore affirm the judgment.[2]

### FACTUAL AND PROCEDURAL BACKGROUND

In June 2002, plaintiff filed in San Diego County a class action lawsuit against Perot, ISO, and Winter. Gribik was brought in as a Doe defendant in June 2003. The complaint alleged UCL violations. It also alleged other counts, which we need not address because plaintiff expressly abandons them on appeal.

The complaint's "INTRODUCTION" alleged: "This action is brought under California's criminal antitrust and unfair competition laws. It seeks recovery of damages, and other monetary, equitable and injunctive relief arising from [Perot's] aiding and abetting in the manipulation, distortion, and corruption of California's electricity market including derivatives. Defendants' unfair and unlawful business practices include conspiring to establish phoney strategies designed to 'game' the California markets. Those strategies

---

[1] Undesignated statutory references are to the Business and Professions Code.

After the filing of the opening brief on appeal, but before the filing of the respondents' briefs and appellant's reply brief, the voters of California passed Proposition 64 at the November 2004 election. Proposition 64 amended the UCL to delete language that gave any person the right to bring an action to enforce the UCL for the benefit of the general public, and added language that an action on behalf of others may be brought by a private plaintiff (as opposed to a public official) only if that plaintiff complies with the class action statute (Code Civ. Proc., § 382) and "has suffered injury in fact and has lost money or property as a result of such unfair competition." (§ 17204; see § 17203.) The parties have not addressed Proposition 64. The California Supreme Court has under review the issue whether Proposition 64 applies to pending cases. (E.g., *Branick v. Downey Savings & Loan Assn.* (2005) 126 Cal.App.4th 828 [24 Cal.Rptr.3d 406], review granted Apr. 27, 2005, S132433; *Californians for Disability Rights v. Mervyn's, LLC* (2005) 126 Cal.App.4th 386 [24 Cal.Rptr.3d 301], review granted Apr. 27, 2005, S131798.) We need not take sides on this issue, because plaintiff does claim he suffered injury in fact and lost money, and he does seek to pursue this as a class action.

[2] We deny as unnecessary Gribik's motion for judicial notice (filed Dec. 6, 2004) and ISO/Winter's request for judicial notice (filed Dec. 6, 2004).

were designed by PEROT and sold[3] to various market participants for the purpose of cheating Californians out of billions of dollars. It is estimated that defendants' anti-competitive conduct and illegal, unfair and deceptive business practices exploited the general public and caused damage well in excess of $10 billion."

The complaint alleged as follows:

1. Plaintiff was the Mayor of La Mesa but was suing not in his official capacity but on his own behalf and the behalf of a class consisting of all persons in California who have purchased electricity from San Diego Gas & Electric (SDG&E), Southern California Edison (SCE) or Pacific Gas & Electric (PG&E) for purposes other than resale or distribution since 1999.

2. ISO is a California mutual benefit corporation that operates the "real-time" and "ancillary services" power markets and manages the electricity transmission grid covering most of California. Winter is ISO's president and corporate executive officer.

3. Perot, a Delaware corporation doing business in California, developed and implemented the business systems used to operate ISO and the California Power Exchange (PX).

4. In 1996, California enacted Assembly Bill 1890 (1995–1996 Reg. Sess.) (Bill No. 1890), codified as Public Utilities Code section 330 et seq. (Stats. 1996, ch. 854, § 10), to restructure the California electricity market. Bill No. 1890 required California's investor-owned utilities (SDG&E, SCE and PG&E) to sell much of their electricity generation capacity in order to create competition in the generation and sale of wholesale electricity. California's deregulation plan envisioned that, by removing a critical portion of wholesale generating capacity from the utilities' control, competitive market forces would attract new sources of power and lower the price of electricity. Instead, a limited group of "inside players," including defendants, used the opportunity to manipulate the California market to extract unconscionable profits. Defendants helped energy companies (Duke, Reliant, Dynegy, Mirant, and Williams/AES) to devise deceptive schemes and engage in fraudulent and unlawful business conduct that thwarted the vision of a competitive energy market.

5. Bill No. 1890 also established ISO and the PX. The PX was to operate a market for the purchase and sale of electricity for delivery during the same or

---

[3] The factual allegations of the complaint did not allege Perot *sold* confidential information and did not specifically allege the utility overcharges went into the pockets of these defendants. Rather, the factual allegations alleged that Perot *gave* or *provided* the information to "co-conspirators" (power producers and traders) who profited. The complaint inconsistently portrayed ISO as a victim and a conspirator that acquiesced in the market manipulation.

next day. ISO was to manage the transmission network, procure electricity during actual operation ("real time") in order to manage imbalances between demand and supply as they occur, and to maintain the reliability of the transmission grid. ISO's board of directors was comprised of energy company representatives and other stakeholders in the electricity marketplace. The electricity purchases administered by ISO and the PX were for subsequent resale, primarily to customers of the investor-owned utilities.

6. Substantial portions of the electricity requirements for any given day were scheduled through the PX in conjunction with ISO. ISO also was able to procure real-time energy as needed. These markets operate in one-hour increments (and even in 10-minute increments), requiring bidding, sales, and purchases for each one-hour or 10-minute increment. Ancillary services are separate markets operated by ISO for the delivery of electricity on demand. Generators bid into ancillary service markets and, when their bids are accepted, agree to provide electricity if ISO determines, through the operation of the grid, that the electricity is needed.

7. Perot was hired to set up the computer systems that controlled California's deregulated energy market. Perot also provided business consulting and applications development services used by ISO and the PX to administer the power markets and transmission grid. Perot designed and implemented systems that allowed and facilitated energy market manipulation by market participants. Perot identified holes and gaps in ISO's operating systems that could allow generators and traders to "game" the market and increase their profits through deceptive and fraudulent means. Perot aided and abetted the market participants in manipulating the market through bogus, fraudulent gaming strategies. Perot provided generators and traders with a detailed blueprint of how to exploit the market's holes and gaps.

8. Perot created and gave to market participants a document proclaiming, "PEROT systems discovered a hole in the ISO's protocols for buying, selling, and pricing imbalance energy." The document instructed participants to "find leverage points you can use" and said gaps in the protocols "provide opportunities for increased profits." The document warned there may be a limit to the "window of opportunity" to exploit the system before ISO recognized the gaps and revised its protocols to close them. The document said that, if market participants followed Perot's strategies, even a small participant could control prices in California and destabilize the electricity market.

9. The "game plan" Perot shared with its "co-conspirators" included specific collusive and fraudulent trading strategies, which were used by market participants to manipulate the market. The strategies took on code

names within the industry, e.g., Megawatt Laundering, the Black Widow, Load Shifting, Get Shorty, Ricochet, Forney's Perpetual Loop, and Cong Catcher. For example, Death Star was designed to create artificial congestion (a traffic jam when scheduled electricity traveling over the transmission line exceeds the line's capacity). To resolve the congestion, a party planning to use a congested line may receive from ISO a substantial payment (a decremental energy payment) *not* to use the line. Traders and generators would schedule energy over a transmission line they knew would be congested at a given point, even though they had no intention of actually using that line, in order to receive a payment *not* to use the line. Another scheme was Inc-ing, in which traders entered into bogus transactions in the "day-ahead" markets that had the effect of artificially inflating demand for electricity while simultaneously artificially diminishing the supply of power. The purchaser in the dummy transaction would thereafter draw only a fraction of the power it had purchased, allowing the seller to sell the excess power. In another scheme, Load Shift, traders overstated electrical load in one geographic zone, while understating it in another zone. By doing so, prices for power in the artificially congested zone would rise. The trader would then cancel or not use some or all of the power ordered in the high congestion zone. The trader would then receive a payment from ISO for not using the power.

10. Each of these schemes involved the use of dummy trading, collusion between market participants, false representations, and deceptive business practices. As a result of Perot's conduct, market participants did engage in market manipulation on a massive scale, realizing extraordinary profits at the expense of plaintiff and Californians.

11. ISO and its employees acquiesced in and facilitated Perot's wrongful conduct by combining with other market participants to manipulate and destabilize the market through dummy trades and manipulation of the transmission grid. ISO and Winter elicited fictitious load schedules from market participants, provided market information to market participants, and otherwise failed to act upon or alert appropriate authorities of the fraudulent and deceptive business practices.

12. Perot continued to aid the market participants, including at times ISO, in modifying and updating deceptive schemes designed to create volatility in the energy markets and transmission grid.

13. Defendants conspired with market participants to engage in deceptive, unlawful, and fraudulent gaming practices designed to raise, depress, fix, rig, and destabilize the California electricity market. ISO and Winter acquiesced in, aided, and conspired with market participants "through activities such as[]

eliciting fictitious load schedules from market participants; providing market information to market participants; and otherwise failing to act upon or alert appropriate authorities of fraudulent and deceptive business practices of market participants."

The complaint labeled the UCL counts as the second, third, and fourth causes of action, and included a reference to the UCL in the fifth cause of action. The second count alleged defendants' violation of antitrust laws, by engaging in anticompetitive practices, constituted unfair business practices under the UCL. The third count alleged defendants' conduct, which precipitated an emergency and occurred during the emergency, was immoral, unscrupulous, or offended public policy, shamelessly profiteering at consumers' expense. The fourth count alleged defendants profited from unfair practices that caused an electricity emergency in California and violated Penal Code section 396 (which prohibits excessive and unjustified increases in prices to consumers when a state of emergency disrupts the market). The fifth count alleged defendants violated the UCL by violating Penal Code section 395, which makes it a misdemeanor to employ fraudulent means to affect market prices. The complaint alleged defendants violated section 17200[4] by engaging in unlawful business acts and practices, resulting in a state of emergency in California.[5]

The prayer for relief asked for, among other items, (1) "restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful or unfair business act or practice"; (2) an order for defendants to cease all acts of unfair competition and enjoin defendants from continuing to conduct business via the unlawful or unfair practices.

On July 26, 2002, defendants removed the lawsuit to federal court. Plaintiff filed a motion to remand the case to state court. On April 18, 2003, the federal court remanded the case to state court, ruling in part that none of the requests for relief under the UCL necessarily hinged on what constitutes "just and reasonable" rates under the Federal Power Act (FPA), title 16 United States Code sections 824 through 824m (which delegates to the Federal

---

[4] Section 17200 provides in part: "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 [advertising] (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code)."

[5] The Governor declared a state of emergency with respect to energy in California on January 17, 2001. (*Pacific Gas & Electric Co. v. Department of Water Resources* (2003) 112 Cal.App.4th 477, 481 [5 Cal.Rptr.3d 283].) In November 2003, former Governor Davis declared an end to the state of emergency. (Kasler, *Davis Declares End to Energy Crisis,* Sacramento Bee (Nov. 14, 2003) p. A3.)

Energy Regulatory Commission (FERC) the exclusive authority to regulate the transmission and sale of wholesale electric energy in interstate commerce).

Back in state court, the case was transferred from San Diego to Sacramento County on July 28, 2003, pursuant to a motion to change venue filed by ISO and Winter.

Perot filed a demurrer and a motion to strike class action and damages allegations. Perot argued plaintiff had not pleaded facts entitling him to any relief, plaintiff did not allege Perot received any portion of the utility overcharges, and the lawsuit was barred by federal preemption and the "filed rate doctrine" (which provides that state law may not be used to invalidate a rate that a federal agency has reviewed and filed).

The other defendants filed joinders in Perot's motion to strike (with Gribik filing his own motion that merely said he joined and incorporated by reference Perot's motion).

ISO and Winter filed a demurrer, making points similar to Perot's demurrer and adding that ISO and Winter could not have benefited from any UCL violations because the ISO is merely a "pass through" entity that does not profit from energy transactions. Because ISO and Winter never retained any of the increase in electricity prices, there was nothing for them to restore under the UCL. They also argued plaintiff was not entitled to injunctive relief because he alleged no ongoing enjoinable conduct by ISO or Winter.

Gribik also filed a demurrer, repeating points made by others and adding that there were no specific allegations against him, and plaintiff failed to exhaust administrative remedies.

Plaintiff filed combined oppositions to the various demurrers and motions to strike. He argued, among other things, that the lawsuit was not barred by federal law, because the UCL violations were unrelated to the rate of wholesale or resale electricity prices. He asserted he did not seek a refund for money spent for his electricity, but did seek restitution of any monies wrongfully received from him, and any profits. Plaintiff asserted (with an appended request for judicial notice) that he sought restitution of $250 million that ratepayers paid for ISO's start-up costs, of which $57 million went to Perot to design and implement the system.

Defendants filed replies. Perot's reply asserted ISO already implemented corrections to prevent game opportunities. Perot submitted declarations asserting plaintiff could never state a claim against it, because no action was brought by the California Attorney General's office or any other governmental enforcement authority.

On January 28, 2004, the trial court sustained all demurrers without leave to amend and granted the motions to strike. The court said plaintiff was seeking to recover money paid in the form of excessive electricity charges. The court concluded this remedy was not available under the UCL, and plaintiff could not allege a UCL claim that would not be barred by either federal preemption or the filed rate doctrine. The court also concluded there was no allegation of continuing conduct to justify injunctive relief under the UCL. The court said the fifth count for fraud was not pleaded with sufficient specificity, and the sixth and seventh counts (for conspiracy and aiding/abetting fraud) failed to plead facts showing something was done which, without the conspiracy or aiding/abetting, would give rise to a cause of action.

The ruling said the court asked plaintiff what facts could be truthfully alleged in an amended complaint to cure the defects, but no specific facts were stated by counsel. However, the court's tentative ruling (incorporated by reference in the ruling) acknowledged, "plaintiff contends that his claims are not barred by the filed rate doctrine, as they do not relate to any approved tariff and challenge only non-rate related conduct of defendants. Plaintiff concedes that he cannot obtain the recovery of the electricity overcharges, but argues that he can recover Cal/ISO's $250 million start-up costs and $57 million contract amount paid by Cal/ISO to Perot for the development and implementation of Cal/ISO's computer systems. These damages are not mentioned in the complaint. Plaintiff asserts that he seeks damages caused by defendants' conduct in contracting to design and implement trading protocols and platforms for California's deregulated energy market, undertaking a duty to act on behalf of and in the best interests of California rate payers and the state, but instead designing a system which allowed for market manipulation, taking rate-payers' money for performing services purportedly on their behalf while at the same time providing confidential and/or restricted information on how to exploit the system to energy producers, traders and sellers, for the purpose of gaming California's energy market. [¶] Plaintiff contends that because providing insiders' information to market participants is not a direct challenge to FERC's authority to set rates, it does not require the application of the filed rate doctrine. [¶] However, as the damages incurred by plaintiffs as California retail rate payers, are the overcharges for wholesale rates passed on to the retail electricity customers, the damages requested are barred by the filed rate doctrine. Even non-providers of electricity are protected by the filed rate doctrine."

On February 17, 2004, the court entered a judgment of dismissal, from which plaintiff timely appealed.

## DISCUSSION

### I. *Standard of Review*

■ In reviewing a judgment dismissing a complaint on a demurrer, we assume the complaint's properly pleaded or implied factual allegations are true, and we give the complaint a reasonable interpretation, reading it in context. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].) We also consider judicially noticeable matters. (*Ibid.*) If we see a reasonable possibility that the plaintiff could cure any defects by amendment, then we conclude the trial court abused its discretion in denying leave to amend. (*Ibid.*) If we determine otherwise, we conclude it did not. (*Ibid.*) The plaintiff has the burden of proving that an amendment would cure the defect. (*Ibid.*)

### II. *No Viable UCL Remedy Against These Defendants*

■ The UCL limits the remedies available for UCL violations to restitution and injunctive relief (and civil penalties, which are not at issue in this appeal). (§§ 17203,[6] 17206 [civil penalties in actions brought by the Attorney General or local public prosecutor].) "[T]he UCL 'is not an all-purpose substitute for a tort or contract action.' [Citation.] Instead, the act provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices. . . . [T]he 'overarching legislative concern [was] to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition.' [Citation.] Because of this objective, the remedies provided are limited. While any member of the public can bring suit under the act to enjoin a business from engaging in unfair competition, it is well established that individuals may not recover damages. [Citation.]" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1150 [131 Cal.Rptr.2d 29, 63 P.3d 937] (*Korea Supply*).)

As we shall see, neither restitution nor injunctive relief is available in this case.

---

[6] Section 17203 provides: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, *including the appointment of a receiver, as may be necessary* to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

### A. *Restitution*

Plaintiff argues he was entitled to seek restitution, which he appears to define as any money defendants or their conspirators received. Although not made clear by plaintiff, it appears the possibilities would be (1) utility overcharges (though it is not clear whether plaintiff thinks any of that money went into the pockets of these defendants, as opposed to nonparty energy producers/suppliers); profits defendants may have received from third parties (assuming Perot sold confidential information to producers/suppliers); or (3) ISO's $250 million start-up costs, of which $57 million was paid for Perot's contract to design and implement the system. We shall explain that none of these possibilities presents viable UCL restitution claims.

■ "Restitution" is an ambiguous term, sometimes referring to the disgorging of something that has been taken and sometimes referring to compensation for injury done. (*People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 134 [3 Cal.Rptr.3d 429] (*Beaumont*).) However, in the context of the UCL, "restitution" is limited to the return of property or funds in which the plaintiff has an ownership interest (or is claiming through someone with an ownership interest). (111 Cal.App.4th at pp. 134–135.)

■ Thus, the California Supreme Court has defined a UCL order for restitution as one " 'compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person.' [Citation.]" (*Korea Supply, supra,* 29 Cal.4th at pp. 1144–1145, citing *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 126–127 [96 Cal.Rptr.2d 485, 999 P.2d 718] (*Kraus*).) "Restitution" under the UCL is not limited to money that was once in the plaintiff's possession but also includes money in which the plaintiff had a vested interest. (*Korea Supply, supra,* 29 Cal.4th at p. 1149.)

The complaint sought "disgorgement of all ill-gotten monies" but did not allege the existence of any ill-gotten monies other than the difference in electricity rates in excess of what customers would have paid in the absence of defendants' conduct.

Defendants argue, among other things, that the alleged utility overcharges cannot be recovered in this lawsuit, because they are the subject of proceedings before FERC, and claims to recoup the alleged overcharges are barred by federal preemption and the "filed rate doctrine."[7] Plaintiff briefly addresses

---

[7] Under the filed rate doctrine, "interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates." (*Nantahala Power & Light v. Thornburg* (1986) 476 U.S. 953, 962 [90 L.Ed.2d 943, 951, 106

these federal issues, arguing they do not apply because he is not challenging the amount of the electricity rates. We need not address these federal principles, because plaintiff has disavowed any attempt to recover alleged utility overcharges.

Thus, in opposing the demurrers in the trial court, plaintiff filed an opposition memorandum stating that, although plaintiff sought "restitution of any monies wrongfully received from Plaintiff," "Plaintiff in the instant action does not seek a refund for money spent for his electricity. Plaintiff seeks recovery of the money unlawfully obtained by defendants and for damages unrelated to the cost of electricity which defendants caused through their unlawful conduct."

On appeal, plaintiff argues as follows:

"[Plaintiff]—and the class he represents—is entitled to restitution under the UCL. But the trial court focused exclusively on [plaintiff]'s damages (i.e., 'the overcharges for wholesale rates passed on to the retail electricity customers.' . . . That remedy focuses on [plaintiff]'s loss and seeks to compensate for that loss. This damages remedy is not available under the UCL.

"But [plaintiff] is entitled to restitution which aims at preventing defendants' unjust enrichment. Restitution is measured by defendants' wrongful gain, not [plaintiff]'s loss (i.e., overcharges). Thus, the focus of restitution is on defendants' unjust enrichment. Restitution simply returns that which defendants obtained from [plaintiff] as a result of their wrongful conduct. That remedy is measured by defendants' gain, not [plaintiff]'s loss.

"To the extent defendants profited from their UCL violations, defendants should be ordered to return those monies. Those funds should be dispersed back to the customers from whom it was taken. That is restitution. Plain and simple."

In a footnote, plaintiff says he "does not challenge the rates he paid. To the contrary, [plaintiff] would have paid any rate to keep the power on in order to protect the health and safety of Californians. After all, there was an energy crisis."

---

S.Ct. 2349].) The right to a reasonable rate is the right to the rate fixed by FERC and, except for review of FERC's orders, the court can assume no right to a different rate on the ground it is more reasonable. (*Id.* at p. 963.) "[T]he filed rate doctrine applies not only to . . . federal-court review . . . , but also to decisions of state courts. In this application, the doctrine is not a rule of administrative law designed to ensure that federal courts respect the decisions of federal administrative agencies, but a matter of enforcing the Supremacy Clause." (*Id.* at pp. 963–964.)

Thus, plaintiff does not seek to recover the alleged utility overcharges.

Plaintiff argues the court should order defendants to "simply return to plaintiff exactly what was wrongfully taken, plus any profits made." However, plaintiff fails to suggest what was taken that would be recoverable in a UCL action.

As we explain *post*, *nonrestitutionary* profits (which plaintiff ties into his class action argument) are not available in this UCL action.

As to the return of "what was wrongfully taken," it is not clear whether plaintiff thinks any of the alleged utility overcharges went into the pockets of these defendants (as opposed to the energy producers/suppliers), but in any event plaintiff has stated he "does not seek a refund for money spent for his electricity." If plaintiff, in his somewhat convoluted argument, means to suggest he can recover the same money under a different label of "unjust enrichment" or "ill-gotten gain," we reject such sophistry.

Thus, plaintiff relies on general principles of the law of remedies, e.g., that restitution in the broad sense focuses on the defendant's unjust enrichment, rather than the plaintiff's loss. Plaintiff's generalization fails to acknowledge the specific limitation applicable in the UCL context—that restitution means the return of money to those persons from whom it was taken or who had an ownership interest in it. (*Korea Supply, supra*, 29 Cal.4th at pp. 1144–1145.) Although this restitution serves to thwart the wrongdoer's unjust enrichment, courts ordering restitution under the UCL "are not concerned with restoring the violator to the status quo ante. The focus instead is on the victim." (*Beaumont, supra*, 111 Cal.App.4th at pp. 134–135.) The object is to return to the plaintiff funds in which he or she has an ownership interest. (*Ibid.*) Thus, plaintiff's assertion that defendants received ill-gotten gain does not make a viable UCL claim unless the gain was money in which plaintiff had a vested interest. As indicated, plaintiff admitted in the trial court that he "does not seek a refund for money spent for his electricity."

We also reject plaintiff's apparent position that he could recover money Perot received from third parties. Thus, plaintiff's opening brief on appeal includes references to numerous documents, judicially noticed by the trial court, that were initially submitted to the federal court in connection with the remand motion. Though not clear, it appears plaintiff means to suggest these documents show Perot sold insider information about California's situation to teach energy generators/suppliers how to manipulate the market. However, the documents merely reflect Perot's attempts to market its consulting services to others; they do not reflect any contracts entered or sale of

information or money received by Perot. In any event, even assuming Perot sold confidential information, plaintiff fails to show that such profit, received from third parties, would qualify as money taken from plaintiff or money in which plaintiff had a vested ownership interest, so as to be recoverable as restitution in this UCL action. (*Korea Supply, supra,* 29 Cal.4th at pp. 1144–1145, 1149 [restitution under UCL is limited to the return of money to those persons who had an ownership interest].)

Plaintiff suggests it was not necessary to show that these defendants received any of the ill-gotten gain from the utility overcharges, because restitution does not require tracing of money. However, plaintiff merely cites *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442 [153 Cal.Rptr. 28, 591 P.2d 51], which said classwide restitution may be ordered without absolute proof of each class member's lack of knowledge that he or she was being defrauded by the unfair practice. (*Id.* at pp. 449–454.) This point does not assist plaintiff in this appeal.

Plaintiff suggests that these defendants can be ordered to restore money received by nonparties, because defendants acted as conspirators or aiders/abettors. It is not clear what money is at issue, since plaintiff does not seek a refund of utility overcharges. Even assuming the unspecified monies could constitute UCL restitution, the argument fails.

 Thus, some of plaintiff's cited cases addressed fraud, despite the fact that plaintiff has expressly waived the trial court's sustaining of the demurrer to the complaint's counts for conspiracy to commit fraud and aiding/abetting fraud. Moreover, although the UCL counts of the complaint also alleged Perot and ISO were "co-conspirators" or aiders/abettors with the energy producers/traders (alleged as Doe defendants), plaintiff fails to cite any authority that a UCL plaintiff may recover money from a defendant who never received it on a theory that the defendant conspired with or aided someone else who did receive it. This sounds like damages (which are unavailable under the UCL) rather than restitution.

Thus, plaintiff cites *People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879 [132 Cal.Rptr. 767] (*Bestline*) for the proposition that all participants in a UCL violation are ripe targets. However, the cited pages of *Bestline* merely said conspirators and aiders/abettors are liable for misrepresentations made pursuant to a conspiracy to defraud. (61 Cal.App.3d at pp. 917–920.) Moreover, *Bestline* said nothing about recovering restitution from a defendant who received nothing. *Bestline* was an action by the state (not by a private plaintiff) against a cleaning products company, its holding company and its officers, for operating or participating in a deceptive marketing program, in violation of a consent decree enjoining them from doing so. (*Id.* at pp. 885,

910.) The trial court entered a judgment permanently enjoining the misconduct, assessing civil penalties in specified sums against each defendant, and ordering three defendants (the cleaning products company, its holding company, and corporate officer William Bailey) jointly and severally to offer restitution (the cleaning products company and its holding company "to be primarily liable therefor"). (*Id.* at pp. 903–904.) On appeal, the two companies and Bailey argued they were erroneously held vicariously liable for the tortious acts of others. (*Id.* at p. 917.) The appellate court concluded the defendants were not being held liable vicariously, but rather as conspirators and persons who participated in the misconduct. (*Id.* at p. 918.)

*Bestline* said: "All parties to a conspiracy to defraud are directly liable for all misrepresentations made pursuant to such conspiracy and anyone who knowingly aids and abets fraud or furnishes the means for its accomplishment is liable equally with those who actually make the misrepresentations. In *American Philatelic Soc.* v. *Claibourne* [(1935)] 3 Cal.2d 689 [46 P.2d 135], this rule was applied in a case involving unfair competition. The court said (3 Cal.2d at pp. 696–697): 'To sum up the situation, it is apparent that, if the allegations of the complaint be true, the conduct of respondent in offering for sale these privately perforated stamps will inevitably result in severe pecuniary injury to the appellants, and the gaining by respondent of an advantage arising out of, in the final analysis, duplicity and dishonesty. The fact that respondent is satisfied to take a small profit, leaving to another the actual fraud, the double-dealing and palming off, is wholly immaterial. He who induces another to commit fraud and furnishes the means is equally guilty.' [Citation.]" (*Bestline, supra,* 61 Cal.App.3d at pp. 918–919.) *Bestline* also cited an earlier case that one who aids and abets a fiduciary to make secret profits may be held jointly liable for the profits. (*Id.* at p. 919.) *Bestline* found sufficient evidence of active participation by the defendants. (*Ibid.*)

Thus, *Bestline* does not assist plaintiff in the case before us. It involved fraud, which is not at issue in this appeal. The issue in *Bestline* was vicarious liability versus direct liability. The court did not discuss recovery of restitution from someone who did not receive anything from the plaintiff as a result of UCL violations. Moreover, the cases cited by *Baseline* involved situations distinguishable from the case before us, i.e., where the defendant did receive a small profit, or where the defendant was a fiduciary of the person who received the profit. Additionally, the older cases predated the UCL, and plaintiff fails to show applicability of the common law principles to the UCL statutes.

Plaintiff cites *People v. Toomey* (1985) 157 Cal.App.3d 1 [203 Cal.Rptr. 642] (another public prosecution yielding a judgment for an injunction, civil penalties and restitution), as imposing liability on a company's president and

chief operating officer, based on the company's misconduct. However, we see nothing in *Toomey* suggesting the defendant did not receive any money from the victims. To the contrary, the court said, "Toomey was in essence, the company," and the court indicated Toomey received money from the victims. (*Id.* at pp. 15, 16 & fn. 5.)

Plaintiff also cites *People v. Orange County Charitable Services* (1999) 73 Cal.App.4th 1054 [87 Cal.Rptr.2d 253], which said one defendant (Cohen) asserted the evidence failed to show he or his fundraising corporations were part of any wrongdoing, but that assertion was belied by the record. (*Id.* at p. 1073.) The appellate court further stated Cohen, by failing to object to the trial court's statement of decision, had waived his contention that the court made no finding he shared an identity with his corporations. (*Id.* at p. 1074.)

Thus, the cases cited by plaintiff do not assist his appeal.

We conclude the complaint failed to allege any viable UCL restitution claim against these defendants.

On appeal, plaintiff argues (as he did in the trial court) that if the complaint is inadequate, he can amend it to allege a viable claim for restitution in that "Perot was paid under a $57 million contract with the ISO and the ISO's funds ultimately came from California electricity consumers because consumers paid for the ISO and therefore consumers paid for Perot to design and implement the ISO. Thus, any monies paid to Perot came from California's electricity consumers." Plaintiff also claims entitlement to recover ISO's start-up costs of $250 million.

We accept for purposes of argument that ratepayers like plaintiff ultimately paid this $250 million, including the $57 million paid to Perot (points disputed by defendants). However, plaintiff does not explain how this money may have been acquired by means of UCL violations. (§ 17203 [authorizing court to order restitution of money "which may have been acquired by means of such unfair competition"].) Rather, this money was for ISO to set itself up, and for Perot to "design and implement the ISO." It appears ISO did set itself up, and Perot did design and implement the ISO. According to plaintiff, the UCL violations consisted of "defendants' design[ing], implement[ing] and manipulat[ing] systems they then exploited, gamed and marketed for profit." The mere design and implementation, without the "exploit[ing], gam[ing] and market[ing] for profit," does not allege a UCL violation. The $250 million did not represent money derived from exploiting, gaming or marketing the system for profit.

Plaintiff does not offer any factual allegations that ISO or Perot received money from UCL violations.

The cases cited by plaintiff merely stand for the proposition that courts have broad authority to fashion a remedy to deter unfair practices. None of the cases authorized a court to fashion a remedy where there was no adequate allegation of recoverable restitution. (E.g., *McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1983) 33 Cal.3d 816, 821 [191 Cal.Rptr. 458, 662 P.2d 916] [allowing a class action to proceed without individualized proof of lack of knowledge of the fraud (regarding compounding of interest by securities broker on customers' debit-balance accounts) was an effective method of accomplishing the disgorgement of property obtained by illegal means]; *People v. Toomey, supra,* 157 Cal.App.3d at p. 20 [injunctive relief was proper where seller of "discount" coupons ceased selling them before trial but continued to sell other forms of coupons using the same deceptive marketing technique]; *Rosales v. Citibank, Federal Sav. Bank* (N.D. Cal. 2001) 133 F.Supp.2d 1177, 1182 [victim of identity theft could state a UCL claim against a bank even though the bank did not acquire plaintiff's money].)

Thus, plaintiff's proposed amendment will not cure the complaint's defect in failing to allege any recoverable restitution.

## B. *Nonrestitutionary Disgorgement*

Plaintiff claims that, because he filed the lawsuit as a class action (certification of which was denied by the trial court), he is entitled to pursue *nonrestitutionary* disgorgement of wrongfully obtained profits, because "fluid recovery"[8] of disgorgement is a remedy available in class actions. We shall

---

[8] "Fluid recovery" refers to the application of the equitable doctrine of *cy pres* (putting charitable trust funds to the next best use if the trust purpose can no longer be accomplished) in the context of a modern class action. (*Kraus, supra,* 23 Cal.4th at pp. 127, 132.) First, the defendant's total damage liability is paid over to a class fund. Second, individual class members are afforded an opportunity to collect their individual shares by proving their particular damages. Third, any residue is distributed as directed by the court. (*Ibid.*) The Legislature authorized fluid recovery in class actions in Code of Civil Procedure section 384, which authorizes the court in class action litigation to direct payment of the residue to, e.g., nonprofit organizations or foundations to support projects that will benefit the class or similarly situated persons, or that promote the law consistent with the objectives of the underlying lawsuit.

The theory underlying fluid class recovery is that since each class member cannot be compensated exactly for the damage he or she suffered, the best alternative is to pay damages in a way that benefits as many of the class members as possible and in the approximate proportion that each member has been damaged, even though some class members may not receive compensation and some non-class-members will benefit from the distribution. (*Kraus, supra,* 23 Cal.4th at p. 128.) Fluid recovery is the "next best use" where funds cannot be delivered precisely to those with primary legal claims. (*Ibid.*)

A fluid recovery remedy is necessary "only when a defendant must disgorge money that is not to be returned to the persons from whom they were [*sic*] obtained . . . ." (*Kraus, supra,* 23 Cal.4th at p. 127.)

conclude that, even assuming for the sake of argument that plaintiff has not forfeited this issue (as urged by defendants), the contention lacks merit.

Although not made clear by plaintiff, nonrestitutionary disgorgement in this case would appear to mean profits allegedly received not from plaintiff's purported class members, but from third parties who allegedly bought the insider information about how to manipulate California's energy market.

■ In general, the term "disgorgement of profits" may include both restitutionary and nonrestitutionary monies. (*Korea Supply, supra,* 29 Cal.4th at p. 1145.) Thus, in general, an order for disgorgement may compel a defendant to surrender all money obtained through its wrongdoing, even though not all of the money is to be restored to the persons from whom it was taken, and regardless of whether the profits represent money taken directly from persons who were victims of the unfair practice. (*Ibid.*)

■ The California Supreme Court has held that, while *restitutionary* disgorgement may be an available remedy under the UCL, *nonrestitutionary* disgorgement is *not* available in a UCL individual action or in a UCL *representative* action (i.e., an action by an individual plaintiff on behalf of others without being certified as a class action).[9] (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 168–172 [96 Cal.Rptr.2d 518, 999 P.2d 706] [employees in UCL representative action could recover unlawfully withheld wages as restitution, but could not recover profits that the employer may have earned by withholding those wages]; *Korea Supply, supra,* 29 Cal.4th at pp. 1145, 1152; *Kraus, supra,* 23 Cal.4th at p. 137; see also *Cruz v. PacifiCare Health Systems, Inc.* (2003) 30 Cal.4th 303, 318 [133 Cal.Rptr.2d 58, 66 P.3d 1157] [dictum: "It may be the case that under the UCL, a class action would allow for disgorgement into a fluid recovery fund"].) The California Supreme Court "held in *Kraus* that while restitution was an available remedy under the UCL, disgorgement of money obtained through an unfair business practice is an available remedy in a representative action only to the extent that it constitutes restitution. We [the California Supreme Court] reaffirm this holding here in the context of an individual action under the UCL." (*Korea Supply, supra,* 29 Cal.4th at p. 1145.)

■ Plaintiff argues these holdings do not extend to UCL *class* actions. We disagree and shall conclude that *nonrestitutionary* disgorgement is not an available remedy in a UCL class action.

An open question exists as to the availability of nonrestitutionary disgorgement in a properly certified UCL class action. (*Frieman v. San Rafael Rock*

---

[9] Proposition 64 eliminated representative actions. (See fn. 1, *ante.*)

*Quarry, Inc.* (2004) 116 Cal.App.4th 29, 36–37 [10 Cal.Rptr.3d 82] [issue need not be decided, because plaintiff failed to show a properly certifiable class].)

Plaintiff maintains the reason the California Supreme Court restricted disgorgement in representative actions was because of due process concerns (multiple suits and duplicative liability), and such concerns are not present in class action litigation. However, the Supreme Court merely cited due process as an "addition[al]" point, after citing the statutory limitation on remedies under the UCL and concluding nonrestitutionary disgorgement resembled damages, which are not recoverable under the UCL. (*Korea Supply, supra*, 29 Cal.4th at pp. 1146, 1150–1151.)

Plaintiff says that because UCL remedies are expressly made "cumulative . . . to the remedies or penalties available under all other laws of this state [(§ 17205[10])]," and because disgorgement into a fluid recovery fund is an available remedy in class actions (Code Civ. Proc., § 384; see fn. 8, *ante*), then *non*restitutionary disgorgement into a fluid recovery fund must be an available remedy in a UCL class action.

We disagree, because "[t]he UCL is a substantive statute and the class action statute is a procedural device for collectively litigating substantive claims." (*Corbett v. Superior Court* (2002) 101 Cal.App.4th 649, 670 [125 Cal.Rptr.2d 46] (*Corbett*).) "Fluid recovery in class actions . . . is merely a method of paying out damages after they have been awarded." (*Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 408 [19 Cal.Rptr.3d 29] [trial court properly sustained demurrer to UCL class claim because nonrestitutionary backpay was not an available remedy in UCL class action].) Thus, the use of the class action vehicle to litigate a UCL claim does not expand the substantive remedies available, and the availability of fluid recovery in a UCL class action (which we presume for purposes of this appeal) says nothing about availability of *non*restitutionary disgorgement of profits.

Plaintiff quotes from *Corbett, supra*, 101 Cal.App.4th 649, that "a plaintiff in a class UCL action is expressly entitled to an injunction and restitution, authorized under the UCL, and to disgorgement into a fluid recovery, as authorized under the class action statutes." (*Id.* at p. 655.)

However, *Corbett, supra*, 101 Cal.App.4th 649, said nothing about *non*restitutionary disgorgement. There, the defendants were a bank and a car dealership that allegedly made car loans at interest rates lower than the rate

[10] Section 17205 provides in full: "Unless otherwise expressly provided, the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state."

disclosed to the customer, and defendants split the excess interest charges paid by the customers. Thus, the disgorgement was restitutionary, to return money to those who had paid it. *Corbett* said disgorgement of profits into a fluid recovery fund was consistent with UCL's deterrent goal of requiring wrongdoers to surrender all illicit profits. (101 Cal.App.4th at p. 668.) If disgorgement into a fluid recovery fund were unavailable, defendants engaging in the unfair practice would be able to keep monies obtained from victims who could not be located. (*Ibid.*) *Corbett* held the trial court improperly concluded that, as a matter of law, it could not certify a class to pursue a UCL claim. *Corbett* remanded the case to the trial court for further consideration of the class action matter. (101 Cal.App.4th at p. 673.)

Thus, the money to be disgorged in *Corbett, supra*, 101 Cal.App.4th 649, was money taken from the victims (i.e., restitutionary disgorgement), not money obtained from third parties (nonrestitutionary disgorgement). Although a fluid recovery fund in such a case might result in money going to an alternative recipient that did not have an ownership interest in the funds, that result occurs only because some class members who *did* have an ownership interest in the money did not claim their share of the judgment. Plaintiff cites no authority supporting nonrestitutionary disgorgement of monies to which no class member ever had an ownership interest.

We conclude plaintiff fails to show grounds for reversal with respect to denial of class action certification.

We conclude plaintiff has failed to show any grounds for reversal of the judgment with respect to the remedy of restitution.

### C. *Injunctive Relief*

As indicated, the UCL also authorizes injunctive relief. (§ 17203; fn. 6, *ante*.)

Plaintiff argues he was entitled to injunctive relief. We disagree.

The complaint prayed that the court "order defendants to immediately cease all acts of unfair competition and enjoin defendants from continuing to conduct business via the unlawful and unfair business acts or practices as described herein . . . ."

However, the complaint's factual allegations did not allege a continuing threat of such misconduct. The complaint's factual allegations referred only to acts that happened in the past, i.e., Perot *was* hired to set up the

deregulated market system, the ISO markets *were* susceptible to manipulation, Perot *warned* its conspirators of a limited window of opportunity to exploit the system before ISO noticed and closed the gaps, etc. The complaint alleged defendants caused a state of emergency to be declared in California in January 2001 and "profited by their unlawful and unfair acts and practices during California's declared electricity emergency."

Former Governor Davis declared an official end to the state of emergency on November 14, 2003, *before* the trial court denied injunctive relief in January 2004. (Kasler, *supra,* p. A3.) Plaintiff does not seek to amend the complaint to allege any ongoing or threatened acts.

■ Injunctive relief is appropriate only when there is a threat of continuing misconduct. (Code Civ. Proc., § 525 ["injunction is a writ or order requiring a person to refrain from a particular act"]; *Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1403, fn. 6 [120 Cal.Rptr.2d 392] (*Gafcon*).)

Plaintiff argues he did not need to allege a threat of future misconduct, because injunctive relief under the UCL is not limited to ongoing or threatened acts. He quotes section 17203, as amended in 1992 (Stats. 1992, ch. 430, § 3, p. 1707), that "[a]ny person who engages, *has engaged,* or proposes to engage in unfair competition may be enjoined . . . ." (Italics added.) The prior statute said any person "performing or proposing to perform an act of unfair competition" could be enjoined. (Stats. 1977, ch. 299, § 1, p. 1202.)

■ However, section 17203, as amended in 1992, continued to provide in the next sentence that "[t]he court may make such orders or judgments . . . as may be necessary to *prevent* the use or employment by any person of any practice which constitutes unfair competition . . . ." (Italics added.) Thus, there must still be something to prevent, i.e., some threat of future misconduct.

Under the pre-1992 statute: "Injunctive relief under section[] 17203 . . . cannot be used, however, to enjoin an event which has already transpired; a showing of threatened future harm or continuing violation is required. [Citation.] Injunctive relief has no application to wrongs which have been completed [citation], absent a showing that past violations will probably recur. [Citation.]" (*People v. Toomey, supra,* 157 Cal.App.3d at p. 20.)

The purpose of the 1992 amendment was not to expand the reach of injunctions, but to abrogate case law that had held the UCL applied only to "practices," and a single act of misconduct could not constitute a "practice."

Thus, plaintiff cites *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553 [71 Cal.Rptr.2d 731, 950 P.2d 1086], which observed in dictum that the 1992 amendment to section 17203 overruled former case law that had interpreted the UCL's "unfair practice" requirement to mean something more than a single transaction. (*Stop Youth Addiction, Inc., supra,* at pp. 570, 558 [defining the issue as whether a private party could maintain a UCL action on behalf of the general public against a retailer that sells cigarettes to minors].) In describing the history of the UCL, the Supreme Court said, "in 1992, the Legislature amended section 17200 to expand the definition of unfair competition to include '*any* unlawful, unfair or fraudulent business *act or* practice' [citation] and amended section 17203 to expand the scope of injunctive relief to encompass past activity and out-of-state activity. (See Stats. 1992, ch. 430, § 3, p. 1707 [replacing 'person performing or proposing to perform an act of unfair competition within this state' with 'person who engages, has engaged, or proposes to engage in unfair competition']．) The 1992 amendments overruled former case law that had limited the statute's application. (See *State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1169–1170 [252 Cal.Rptr. 221, 762 P.2d 385] [UCL's ' "practice" requirement envisions something more than a single transaction'].)" (*Stop Youth Addiction, Inc., supra,* at p. 570.)

Similarly, the other cases cited by plaintiff merely acknowledged the UCL now covers any unfair "act or practice," such that single acts of misconduct may form the basis for a UCL lawsuit. (*Klein v. Earth Elements, Inc.* (1997) 59 Cal.App.4th 965, 969, fn. 3 [69 Cal.Rptr.2d 623] [affirmed summary judgment in favor of defendant, a pet food distributor that unwittingly distributed contaminated pet food, promptly recalled the product, and afforded restitution]; *Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 653–654 [58 Cal.Rptr.2d 89] [1992 amendment that UCL applies to unlawful "act or practice" defeated defendant's contention that the evidence merely established isolated instances of deceptive conduct rather than a business practice].)

Neither the statutory amendment nor any of the cases cited by plaintiff authorizes injunctive relief in the absence of a threat that an unlawful act will occur in the future.

■ Instead, as stated in cases cited by Perot (and ignored in plaintiff's reply brief), the general rule is that an injunction may not issue unless the alleged misconduct is ongoing or likely to recur. Thus, *Gafcon, supra,* 98 Cal.App.4th 1388, which held a declaratory relief action could not be pursued in the absence of an active controversy, said the plaintiff's case would not be aided by adding the defendant to a separate cause of action for injunctive relief, because: "Ordinarily, injunctive relief is available to prevent threatened

injury and is not a remedy designed to right completed wrongs. [Citations.] 'It should neither serve as punishment for past acts, nor be exercised in the absence of any evidence establishing the reasonable probability the acts will be repeated in the future. Indeed, a change in circumstances at the time of the hearing, rendering injunctive relief moot or unnecessary, justifies denial of the request.' [Citation.] Unless there is a showing that the challenged action is being continued or repeated, an injunction should be denied. [Citation.]" (*Id.* at p. 1403, fn. 6.)

■ "Injunctive relief has no application to wrongs which have been completed [citation], absent a showing that past violations will probably recur. [Citation.]" (*People v. Toomey, supra,* 157 Cal.App.3d at p. 20.)

*Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644 [22 Cal.Rptr.2d 419] affirmed a denial of class certification of a UCL case, noting the defendant had altered its conduct pursuant to federal administrative intervention, and therefore the plaintiff's "prayer for injunction was effectively moot. '[W]hen as here, the assertedly wrongful practice has ended long before the action is filed, its requested termination is a rather empty prayer.' " (*Id.* at p. 660.)

■ A trial court's denial of injunctive relief was affirmed in *Cisneros v. U.D. Registry, Inc.* (1995) 39 Cal.App.4th 548 [46 Cal.Rptr.2d 233], which said, "The injunctive remedy should not be exercised 'in the absence of any evidence that the acts are likely to be repeated in the future.' [Citation.]" (*Id.* at p. 574.)

■ We conclude the current UCL has not altered the nature of injunctive relief, which requires a threat that the misconduct to be enjoined is likely to be repeated in the future.

Here, plaintiff's complaint did not allege any facts that another incident is likely to occur.

Plaintiff argues defendants' conduct was ongoing and likely to recur, but he fails to point to any supporting factual allegation in his complaint. He merely says he asked the court to order defendant to stop the unlawful acts. He says if there were any question, the trial court should have granted leave to amend the complaint. However, plaintiff fails to identify any amendment he would have made to cure the problem. He merely asserts, "there could not have been any question because the record before the trial court clearly established defendants' conduct was ongoing and likely to recur. The ISO is still responsible for managing California's electrical grid and for ensuring the safe and reliable transition of electricity throughout the grid. [Citation.] Perot still

has inside information about the ISO and PX systems. Even though some of the gaps in the system were supposedly closed, 'closing one gap may open others.' [Citation.]

"The games Perot taught continue to have 'ongoing benefits.' [Citation.] 'Because the rules and markets are evolving,' these games 'will continue to see changes.' [Citation.] Therefore, Perot continues to aid traders and other California market participants—including the ISO—by modifying and updating deceptive schemes designed to create volatility in the energy markets and transmission grid. [Citation.] Because defendants' wrongful conduct is ongoing and likely to recur, [plaintiff] was entitled to seek injunctive relief for this reason too."

The documents cited by plaintiff (even assuming they were or could be judicially noticed) do not help him. Thus, plaintiff points to documents generated in the late 1990's (e.g., Gribik's "power point presentation" and a 1998 proposal to Enron) stating things such as (1) "Closing one gap may open others"; (2) one of the "on-going benefits" of the presentation would be the education of Enron's staff "in the process used for examining these situations"; and (3) "Because the rules and the market are evolving, [the first phase of the proposal] will continue to see changes." These documents from the late 1990's did not show a continuing threat at the time the complaint was filed in June 2002. Moreover, the 1998 proposal spoke of the future extension of games in markets *other* than California.

Plaintiff cites newspaper articles quoting Perot and Gribik as defending the use of gaming theory in the energy market. One said, "Gribik noted that energy companies use gaming theory to seek advantages just as a football team would use a playbook." The other said, "Perot said, however, that 'game theory['] is one of the ways that participants compete in a free market." Neither of these quotes suggests that the wrongful conduct *alleged in the complaint* is ongoing or likely to recur.

Plaintiff cites *Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963 [6 Cal.Rptr.2d 193], for the proposition that a court can enter an injunction to make up for past misleading statements. However, that case upheld a court order for the defendant to place a warning on its product (which it continued to sell) in order to correct a misperception created by prior false advertising. (*Id.* at pp. 972–974.) No analogous circumstance appears in the case before us.

We conclude plaintiff failed to present a viable claim for injunctive relief.

Since plaintiff failed to present a viable claim for restitution or injunctive relief (the only remedies available) and failed to propose any amendment that would cure the defect, plaintiff's complaint failed to state a viable UCL claim, and the trial court properly sustained the demurrers without leave to amend.

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal. (Cal. Rules of Court, rule 27(a).)

Blease, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied June 20, 2005, and appellant's petition for review by the Supreme Court was denied October 12, 2005.