165 Cal.App.4th 209 (2008)
JAMES CLAYWORTH et al., Plaintiffs and Appellants,
v.
PFIZER, INC., et al., Defendants and Respondents.
No. A116798.
Court of Appeals of California, First District, Division Two.
July 25, 2008.
*213 Alioto Law Firm, Joseph M. Alioto, Theresa D. Moore, Angelina Alioto-Grace, Joseph M. Alioto, Jr., Thomas P. Pier; Law Offices of James M. Dombroski, James M. Dombroski; Law Offices of Jeffery K. Perkins, Jeffery K. Perkins; Law Offices of John H. Boone, John H. Boone; Foreman & *214 Brasso, Russell F. Brasso; Gary D. McCallister & Associates, Thomas A. Kelliher, Eric I. Unrein and Jaime Goldstein for Plaintiffs and Appellants.
Winston & Strawn, Tyler M. Paetkau, Nicole P. Dogwill, Susan A. Pipal; Eimer Stahl Klevorn & Solberg, David M. Stahl, J. Cunyon Gordon, A. Oyenbanji; Davis Polk & Wardwell, Amelia Starr, Arthur F. Golden, William J. Fenrich, Daniel J. Schwartz; Filice Brown Eassa & McLeod, Peter A. Strotz, William El Steimle, Paul R. Johnson; Kaye Scholer, Aton Arbisser, Bryant S. Delgadillo, Saul P. Morgenstern; Covington & Burling, Theodore Voorhees, Jr., Thomas J. Cosgrove; Elizabeth Abigail Brown, Anita Fern Stork; Gibson, Dunn & Crutcher, Jeffrey T. Thomas, James N. Knight; Oppenheimer Wolff & Donnelly, Gary Hansen, David P. Graham, Aaron Mills Scott; Reed Smith, Michele Diane Floyd; Folger Levin & Kahn, Beatrice Bich-Dao Nguyen, Samuel Ray Miller; Patterson Belknap Webb & Tyler, William Cavanaugh, Jr.; Cleary Gottlieb Steen & Hamilton, George Cary, Sara D. Schotland; Irell & Manella, Alexander F. Wiles, John C. Keith; Dickstein, Shapiro, Peter J. Kadzik, Bernard Nash, Maria Colsey Heard, Milton Marquis, Andres Colin; Nossaman, Gunther, Knox & Elliott, Scott DeVries, Katrina June Lee; Drinker, Biddle & Reath, H. Christian L'Orange, Paul H. Saint-Antoine, David J. Antczak; Hughes Hubbard & Reed, John M. Townsend, Robert P. Reznick, Rita M. Haeusler; Cravath, Swaine & Moore, Elizabeth L. Grayer, Evan R. Chesler, Jessica Buturla, Jeffrey B. Korn; Sedgwick, Detert, Moran & Arnold, Paul J. Riehle, Matthew A. Fischer; Latham & Watkins, Margaret M. Zwisler, Steven H. Schulman; Latham & Watkins, Charles H. Samel, Belinda S. Lee, Jennifer A. Carmassi; Arnold & Porter, Douglas L. Wald, Mark R. Merley, Anne P. Davis, Ronald C. Redcay, Daniel R. Waldman, Ryan Z. Watts; Hogan & Hartson, Joseph H. Young; Faegre & Benson, James A. O'Neal, Kim J. Walker; Mayer, Brown, Rowe & Maw, Steven Oliver Kramer and Donald M. Falk for Defendants and Respondents.

OPINION
RICHMAN, J.
This case presents an issue of first impression in California antitrust law: whether the pass-on defense is available to defendants accused of price fixing. We hold that it is.
Retail pharmacies (plaintiffs) sued pharmaceutical companies (defendants) alleging price fixing, asserting claims for violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.),[1] and for restitution and injunctive relief under the California Unfair Competition Law (UCL) (§ 17200 et seq.). *215 Defendants asserted as an affirmative defense that plaintiffs "passed on" all of the claimed overcharges to their customers. Discovery demonstrated that they did pass on the charges, and plaintiffs further admitted that they sought no other damages, such as lost or delayed sales, aside from the claimed overcharges.
Plaintiffs moved for summary adjudication on the pass-on defense, contending that it is not recognized in California, relying primarily on Hanover Shoe v. United Shoe Mach. (1968) 392 U.S. 481 [20 L.Ed.2d 1231, 88 S.Ct. 2224] (Hanover Shoe), which rejected the pass-on defense, and the legislative history of the Cartwright Act. Defendants filed their own motion, contending that California never adopted the Hanover Shoe holding and that the language of the Cartwright Act makes clear that plaintiffs in an antitrust action cannot recover for an overcharge passed on to a subsequent purchaser.
The trial court decided the cross-motions in favor of defendants, concluding that the pass-on defense is available in California, and that plaintiffs did not suffer any compensable injury within the meaning of section 16750 and thus could not recover on the Cartwright Act claim. The court also concluded that plaintiffs lacked standing to bring a UCL claim because they had not lost money or property and, alternatively, were not eligible for restitution. The trial court thus granted summary judgment. We affirm.

BACKGROUND

1. The Parties and the Pleadings

Plaintiffs are retail pharmacies located in California.[2] Defendants are, with two exceptions, companies that manufacture, market, and/or distribute brandname pharmaceutical products throughout the United States.[3] Defendants also *216 manufacture, market, and/or distribute similar brand-name pharmaceutical products in Canada where, unlike in the United States, the products are subject to government-imposed pricing limitations.
Plaintiffs' action sought treble damages, restitution, and injunctive relief, alleging that defendants fixed the prices of their brand-name pharmaceuticals in violation of the Cartwright Act and the UCL. The case came at issue on the third amended complaint, which alleged that plaintiffs were injured by defendants' purported price fixing "because they have paid more than they otherwise would have or should have paid in the absence of the [d]efendants' violations...."; specifically, plaintiffs alleged that defendants conspired "to eliminate price competition and fix prices" in the United States market by, among other things, using Canadian prices as a "floor" or minimum price for defendants' United States products.
Each defendant filed a separate answer, denying plaintiffs' allegations and asserting as an affirmative defense that plaintiffs' claims were barred on the ground plaintiffs passed on any alleged overcharge to third parties and therefore did not suffer a compensable injury.
The case was designated as complex and assigned to the Honorable Ronald M. Sabraw.

2. The Facts

Over plaintiffs' objection, and without deciding whether the pass-on defense was available in California, Judge Sabraw permitted defendants to conduct discovery "that is relevant to the `pass on' defense." The resulting discovery included requests for production of documents, requests for admissions, form interrogatories, special interrogatories, and depositions. Multiple discovery disputes ensued, resulting in detailed discovery orders providing the parties with guidance as to the discovery to be produced and setting schedules for the production of written discovery and the taking of depositions. In one such order, entered on May 22, 2006, Judge Sabraw concluded that defendants' request that plaintiffs compile information and produce reports regarding their purchases and sale of certain specified drugs was neither overly burdensome nor oppressive, explaining: "No [p]laintiff has submitted a declaration describing how the information is maintained, how it must be retrieved, and the burden of retrieval and organization. The deposition *217 testimony of the witnesses for [five plaintiffs] suggests that the information sought is kept by each of the [p]laintiffs in readily retrievable electronic form and that it can be accessed and organized by [p]laintiffs without undue burden." Judge Sabraw then ordered plaintiffs to produce, among other things, "all responsive purchasing, pricing and sales-related documents and information," including in electronic form where appropriate, within 10 days, with any disputes over the production of the data to be resolved with the assistance of information technology consultants retained by both sides. Judge Sabraw also ordered each plaintiff to "provide a narrative ... describing that [p]laintiff's pricing and price-setting practices."
The resulting narratives, as well as deposition testimony of the persons most knowledgeable and plaintiffs' responses to written discovery, revealed the following salient facts, which are essentially undisputed.
Defendants sell their drugs to wholesalers at a price referred to as the wholesale acquisition cost (WAC). The wholesalers resell the drugs to plaintiffs at prices using a formula mathematically tied to the WAC, called the average wholesale price (AWP), which apparently represents a benchmark price published in lists by companies unrelated to defendants. As a result, when defendants' prices increase, the cost of drugs to plaintiffs increases by the same percentage amount. So, plaintiffs pay the full amount of the alleged overcharge, defined in plaintiffs' brief as "the difference between what [plaintiffs] actually paid and what they would have paid in the absence of the conspiracy."
Plaintiffs sell the drugs to two groups of customers, also on the basis of the AWP: (1) those with "third party" insurance or a drug benefit plan offered by either a private entity or the government, which in turn pay customers' claims on their behalf; and (2) uninsured (or "cash-paying") customers. The vast majority of customers are covered by third party payers, which reimburse plaintiffs at a contractually or statutorily fixed amount, predetermined as a percentage of the AWP plus a dispensing fee, which provides plaintiffs a percentage profit above their acquisition cost. As to the sales to cash-paying customers, plaintiffs charge a set percentage of the AWP, and sometimes a dispensing fee, which could result in plaintiffs' receiving a price above their acquisition cost. The result of this is that each time defendants increase their prices for a product, plaintiffs increase the price they charge their customers by at least the same amount. And the higher defendants' prices, the higher plaintiffs' revenuesand the higher their gross profits.
*218 In sum, discovery demonstrated two undisputed facts: (1) plaintiffs passed on to their customers all claimed overcharges, and (2) plaintiffs waived any claims for damages not based on the alleged overcharge, claiming no lost or delayed sales, or any other diminution in business.[4] Stated conversely, the only damages plaintiffs sought to recover were the claimed overcharges.

3. The Motions

On August 21, 2006, plaintiffs moved for summary adjudication on the pass-on defense, seeking an order striking it on the ground it was unavailable as a matter of law. Plaintiffs argued that the defense could not be asserted against their Cartwright Act claims based on the United States Supreme Court opinion in Hanover Shoe, supra, 392 U.S. 481, the legislative history of the Cartwright Act, and public policy. Plaintiffs also argued that the pass-on defense was inapplicable to the calculation of restitution under their UCL claim.[5]
On September 15, 2006, defendants filed a joint opposition to plaintiffs' motion. They also filed a joint cross-motion for summary judgment or, in the alternative, summary adjudication regarding pass-on issues. Defendants argued that the plain language of the Cartwright Act demonstrates plaintiffs cannot recover damages they did not sustain and that Hanover Shoe has not been adopted in California. Alternatively, defendants argued that "even if a pass-on defense is not generally available under California law, such a defense should be permitted here where it is easy to prove that plaintiffs have not been damaged."[6] Defendants also argued that the pass-on theory defeated plaintiffs' UCL claim.
On December 1, 2006, Judge Sabraw issued a tentative ruling granting defendants' cross-motion and denying plaintiffs' motion as moot. On December 11 and 14, 2006, in response to statements contained in the tentative *219 ruling, plaintiffs filed two separate requests for judicial notice of (1) the legislative history of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (Hart-Scott-Rodino Act; Pub.L. No. 94-435, Sept. 30, 1976, 90 Stat. 1383) and California's 1977 amendment to the Cartwright Act, and (2) the amicus curiae brief filed on behalf of the state of California in Illinois Brick Co. v. Illinois (1977) 431 U.S. 720 [52 L.Ed.2d 707, 97 S.Ct. 2061] (Illinois Brick). Judge Sabraw granted both requests.[7]
The motions came on for hearing on December 15, 2006. Judge Sabraw heard lengthy argument, following which he took the motions under submission.
On December 19, 2006, Judge Sabraw issued a 26-page order containing a comprehensive analysis of the issues presented, concluding that defendants could assert the pass-on defense to defeat plaintiffs' antitrust claims: "[I]n defending a claim under the Cartwright Act, a defendant can present evidence that it has no liability or that its damages are lessened because the plaintiff has passed on the alleged price overcharge and therefore has either suffered no injury or has limited its damages." This ruling was "based primarily on the language of the statute, which limits recovery to `recovery three times the damages sustained.'" Judge Sabraw read the phrase "damages sustained" as referring to the "actual loss incurred by the [p]laintiffs," and concluded that because "[the] undisputed facts demonstrate that if [d]efendants ever overcharged [p]laintiffs as a result of the alleged conspiracy, the [p]laintiffs sustained no damages because they increased their prices to their customers `by at least the same dollar amount.' [¶] ... If [p]laintiffs have not sustained actual damages, then they cannot prevail on their claim." Judge Sabraw thus granted summary adjudication for defendants on the Cartwright Act claims.
As to the UCL claim, Judge Sabraw concluded that plaintiffs lacked standing to pursue this claim because they had not "`lost money or property' as required for standing under section 17204." Alternatively, he concluded that plaintiffs could not be awarded monetary relief under section 17203 because they did not "have an ownership interest in whatever funds they paid as a result of any overcharge" and thus were ineligible for restitution. Judge Sabraw thus granted summary adjudication for defendants on the UCL claim. *220 Having disposed of all of plaintiffs' claims, Judge Sabraw granted summary judgment for defendants.
Judgment pursuant to the December 19, 2006 order was entered on January 4, 2007, from which plaintiffs filed a timely appeal.

DISCUSSION

1. Standard of Review

Code of Civil Procedure section 437c, subdivision (c) provides that summary judgment is properly granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. As applicable here, with moving defendants, they can meet their burden by demonstrating that "[a] cause of action has no merit ...," which they can do by showing that "[o]ne or more of the elements of the cause of action cannot be separately established...." (Code Civ. Proc., § 437c, subd. (o)(1); see also Romano v. Rockwell Internat., Inc. (1996) 14 Cal.4th 479, 486 [59 Cal.Rptr.2d 20, 926 P.2d 1114] [statute of limitations]; Trujillo v. First American Registry, Inc. (2007) 157 Cal.App.4th 628, 632 [68 Cal.Rptr.3d 732] [summary adjudication and judgment properly granted where plaintiffs suffered no damages].) Once defendants meet this burden, the burden shifts to plaintiffs to show the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2).)
On appeal "[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. [Citations.]" (Intel Corp. v. Hamidi (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296].) Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate plaintiffs' claims. (Romano v. Rockwell Internat., Inc., supra, 14 Cal.4th at pp. 486-487.) Or, as we said in Horn v. Cushman & Wakefield Western, Inc. (1999) 72 Cal.App.4th 798, 807 [85 Cal.Rptr.2d 459], in affirming a summary judgment for the defendant employer, "We review the evidence presented to the trial court and independently adjudicate its effect as a matter of law. (Lee v. Crusader Ins. Co. (1996) 49 Cal.App.4th 1750, 1756 [57 Cal.Rptr.2d 550].)"

2. The Law

A. The Cartwright Act

(1) In 1907, the California Legislature enacted the Cartwright Act, section 16700 et seq., which "`generally outlaws any combinations or agreements *221 which restrain trade or competition or which fix or control prices.'" (Pacific Gas & Electric Co. v. County of Stanislaus (1997) 16 Cal.4th 1143, 1147 [69 Cal.Rptr.2d 329, 947 P.2d 291] (Pacific Gas & Electric), quoting Antitrust & Trade Regulation Law Section of the State Bar of Cal., Cal. Antitrust Law (2d ed. 1991) p. 4.) As is pertinent here, section 16750, subdivision (a) provides, "Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor ... and to recover three times the damages sustained by him or her...."
(2) It is often said that the Cartwright Act is patterned after the federal Sherman Act (15 U.S.C. § 1 et seq.) (e.g., Rolling v. Dow Jones & Co. (1982) 137 Cal.App.3d 709, 717 [187 Cal.Rptr. 797]), though "historical and textual analysis reveals that the [Cartwright] Act was patterned after the 1889 Texas act and the 1899 Michigan act...." (State of California ex rel. Van de Kamp v. Texaco, Inc. (1988) 46 Cal.3d 1147, 1164 [252 Cal.Rptr. 221, 762 P.2d 385], overruled in part on other grounds by statute.) Our Supreme Court has noted that "judicial interpretation of the Sherman Act, while often helpful, is not directly probative of the Cartwright drafters' intent...." (Ibid.) And such precedent should be used "with caution." (Freeman v. San Diego Assn. of Realtors (1999) 77 Cal.App.4th 171, 183, fn. 9 [91 Cal.Rptr.2d 534].)
Bruno v. Superior Court (1981) 127 Cal.App.3d 120, 132 [179 Cal.Rptr. 342], a Cartwright Act case, noted that private antitrust lawsuits serve three purposes: (1) compensation, (2) deterrence, and (3) punishment: "although compensation is the primary rationale for the allowance of private antitrust lawsuits, the prevention and punishment of anticompetitive acts is a not insignificant purpose of antitrust laws."

B. Hanover Shoe

Hanover Shoe, supra, 392 U.S. 481, the focal point of the motions below, was an action by plaintiff Hanover Shoe, Inc. (Hanover Shoe), a shoe manufacturer, against United Shoe Machinery Corp. (United Shoe), a manufacturer of equipment used in the shoe-making process. The action alleged that United Shoe had monopolized the shoe industry in violation of the Sherman Act, 15 U.S.C. § 2, by its practice of only leasing, and refusing to sell, its machinery. (392 U.S. at pp. 483-484.) Hanover Shoe sought damages, trebled under section 4 of the Clayton Act, 15 U.S.C. § 15, for the overcharges, amounting to the difference between what it had paid United Shoe in shoe machine rentals and what it would have paid had United Shoe been willing to sell those machines. (392 U.S. at pp. 483-484.)
*222 United Shoe countered that Hanover Shoe suffered no legally cognizable injury because any illegal overcharge was reflected in the price it charged its customers for its shoes, arguing that if Hanover Shoe had purchased the machines at a lower price, it would have charged less for the shoes sold to its customersin short, that Hanover Shoe suffered no loss from the antitrust violation. (Hanover Shoe, supra, 392 U.S. at pp. 487-488.)[8]
The District Court awarded Hanover Shoe damages of $4,239,609. The Court of Appeals affirmed the finding of liability, but disagreed with the District Court on certain questions relating to the damage award. (Hanover Shoe, Inc. v. United Shoe Machinery Corp. (3d Cir. 1967) 377 F.2d 776.)
In a unanimous opinion written by Justice White, the Supreme Court reversed the Court of Appeals on questions relating to the damage award. And as apt to the issue before us, the court held that Hanover Shoe proved injury and the amount of its damages within the meaning of section 4 of the Clayton Act when it proved that United Shoe had overcharged it and showed the amount of the overcharge, and the possibility that it might have recouped the overcharge by "passing it on" to its customers was not relevant in the assessment of its damages: "We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower." (Hanover Shoe, supra, 392 U.S. at p. 489.)
Justice White gave two reasons for the holding. First, establishing the amount of the overcharge passed on to the consumer would present insurmountable evidentiary problems. As he put it, "A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular *223 plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued." (Hanover Shoe, supra, 392 U.S. at pp. 492-493.)
Secondary to the "nearly insuperable difficulty" of establishing the amount of overcharge passed on, Justice White also expressed concern that if a direct purchaser such as Hanover Shoe were not allowed to sue for overcharges passed on to indirect purchasers, antitrust violators "would retain the fruits of their illegality" because indirect purchasers "would have only a tiny stake in [the] lawsuit" and would thus lack the incentive to bring an antitrust action. (Hanover Shoe, supra, 392 U.S. at p. 494.)
Though they will be discussed in detail post, three things about Hanover Shoe deserve mention here. The first is that the opinion holds as it does without analysis of the language of the Clayton Act. The second is that the court did not create an absolute bar to the pass-on defense in all situations. It "recognize[d] that there might be situationsfor instance, when an overcharged buyer has a pre-existing `cost-plus' contract, thus making it easy to prove that he has not been damagedwhere the considerations requiring that the passing-on defense not be permitted in this case would not be present. We also recognize that where no differential can be proved between the price unlawfully charged and some price that the seller was required by law to charge, establishing damages might require a showing of loss of profits to the buyers." (Hanover Shoe, supra, 392 U.S. at p. 494.) Third, and as our colleagues in Division Five would later observe, "Hanover Shoe presented a particularly complicated problem with respect to the pass-on issue." (B.W.I. Custom Kitchen v. Owens-Illinois, Inc. (1987) 191 Cal.App.3d 1341, 1352 [235 Cal.Rptr. 228] (B.W.I. Custom Kitchen).)
Though Hanover Shoe focused on antitrust defendants and the proper limits of defensive arguments, it nevertheless suggested something about the nature of antitrust injury and the category of purchasers who might be viewed as having experienced it. Nine years later, the Supreme Court addressed the issue directly in Illinois Brick, supra, 431 U.S. 720.

C. Illinois Brick and Its Aftereffects

Illinois Brick was the flip side of Hanover Shoe, addressing whether the pass-on theory could be "used offensively by an indirect purchaser plaintiff against an alleged violator." (Illinois Brick, supra, 431 U.S. at p. 726.) Illinois Brick and its codefendants manufactured and distributed concrete block, selling primarily to masonry contractors who then submitted bids to general contractors in charge of construction projects for public entities, such as counties, municipalities, housing authorities, and school districts. Plaintiff *224 State of Illinois brought an action on behalf of itself and local government entities seeking treble damages under section 4 of the Clayton Act, alleging that the defendants had engaged in a conspiracy to fix the prices of the concrete block, the inflated prices of which were ultimately absorbed by the end purchasers of the product. (431 U.S. at pp. 726-727.)
The defendants sought partial summary judgment against all plaintiffs that were indirect purchasers of concrete block, "contending that as a matter of law only direct purchasers could sue for the alleged overcharge." (Illinois Brick, supra, 431 U.S. at p. 727.) The district court granted summary judgment, but the Court of Appeals reversed, "holding that indirect purchasers... can recover treble damages for an illegal overcharge if they can prove that the overcharge was passed on to them through intervening links in the distribution chain." (Id. at pp. 727-728.)
The Supreme Court disagreed. In another opinion by Justice White, this time six to three, the court agreed with the defendants, holding that the plaintiffs as indirect purchasers of the concrete block were not the parties "`injured in [their] business or property'" within the meaning of section 4 and therefore lacked standing to sue in federal antitrust cases. Only the direct purchaser was the injured party. (Illinois Brick, supra, 431 U.S. at pp. 727-729.) The court reached this result in two steps. (Id. at p. 728.)
The court first reasoned that the rule prohibiting use of the pass-on theory "must apply equally to plaintiffs and defendants" because "allowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants." (Illinois Brick, supra, 431 U.S. at pp. 728, 730.) Moreover, the court was concerned that "[p]ermitting the use of pass-on theories under [section] 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overchargefrom direct purchasers to middlemen to ultimate consumers." (Id. at p. 737.) Finally, the court expressed concern that granting standing to indirect purchasers would result in under-enforcement of the antitrust laws. (Id. at pp. 745-747.)[9]
(3) In the wake of the Supreme Court's holding that indirect purchasers lacked standing, numerous states enacted so-called Illinois Brick repealer *225 amendments. One such state was California, where the amendment took the form of Assembly Bill No. 3222 (1977-1978 Reg. Sess.), which added the following language to section 16750: "This action may be brought by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant." The statute enacting the amendment declared that it "does not constitute a change in, but is declaratory of, the existing law." (Stats. 1978, ch. 536, § 2, p. 1696.) So, while indirect purchasers lack standing to bring an action for treble damages under the federal antitrust law pursuant to Illinois Brick, such purchasers can pursue a claim in California. As discussed in detail below, this amendment to the Cartwright Act, as well as other amendments, are heavily relied on by plaintiffs.[10]

D. Post-1978 California Cases

Few California authorities have even mentioned the pass-on issue or Hanover Shoe in the almost 40 years since its publication. And the only three Court of Appeal cases with any meaningful mention of the issue have explicitly recognized that whether or not the pass-on defense is available in California is an open question.[11]
The first case was B.W.I. Custom Kitchen, supra, 191 Cal.App.3d 1341, which involved a class of indirect purchasers of glass containers who alleged that the corporate manufacturers of glass containers had engaged in a conspiracy to set noncompetitive prices for the containers in violation of the Cartwright Act and the UCL. (191 Cal.App.3d at p. 1345.) The trial court denied class certification. Our colleagues in Division Five reversed.
Arguing against class certification, which largely hinged on whether the class would be able to prove that "defendants' overcharges were `passed-on' to them," the defendants contended that "the considerations which persuaded the court in Hanover Shoe[, supra,] 392 U.S. 481 ... to reject a `pass-on *226 defense' should convince this court that the class proposed herein cannot demonstrate on a generalized basis that illegal overcharges were passed on to its members." (B.W.I. Custom Kitchen, supra, 191 Cal.App.3d at pp. 1351-1352.) The court first responded that, "It is important to point out that the facts of Hanover Shoe presented a particularly complicated problem with respect to the pass-on issue. The `product' involved, shoe manufacturing machinery, was not itself resold by plaintiff. In effect, the court was being asked to determine whether plaintiff's pricing decision for shoes reflected the illegal overcharge for the machinery which was used in their manufacture. Where the product in question is ultimately sold to the consumer, and is largely unchanged in form from the price-fixing manufacturer to the indirect purchaser, assessing whether the manufacturer's overcharges were passed on is less difficult.... The insurmountable difficulties found to exist in Hanover Shoe in proving injury are not apparent in the record before us." (Id. at p. 1352.)
Then, after concluding "that the issue of injury can be proven on a class-wide basis," the court said that "It should also be pointed out that both plaintiff and defendants have invoked the pass-on theory in this case. As we have seen, in order to demonstrate that plaintiff and the proposed class were injured by the alleged conspiracy, plaintiff must demonstrate that defendants' illegal overcharges were passed on to them in the form of higher prices for glass containers. Defendants have also invoked the pass-on theory, but have used it defensively instead of offensively. Defendants argue that the indirect purchasers in this case sustained no injury because they passed on any overcharges to their customers further down the chain of distribution. The trial court was apparently of the view that because California has rejected Illinois Brick Co. v. Illinois, supra, 431 U.S. 720, and has allowed indirect purchasers to maintain a cause of action under the Cartwright Act, the defendant should be able to assert this `pass-on defense.' Whether defendants can bar class certification or negate injury by showing plaintiff and the class `passed on' the overcharge is a question that has not been addressed by any California court, and it would be premature to resolve it at this juncture because we do not have an adequate factual record. However, even if a plaintiff has passed on the entire overcharge, he or she is not per se precluded from otherwise proving injury." (B.W.I. Custom Kitchen, supra, 191 Cal.App.3d at p. 1353.)
Sixteen years later came two companion cases also involving the issue of class certification in Cartwright Act cases, both of which stated that "this issue of the availability of a `pass-on defense' in antitrust law still remains an open question in California ...": J. P. Morgan & Co., Inc. v. Superior Court (2003) 113 Cal.App.4th 195, 213, fn. 10 [6 Cal.Rptr.3d 214]; and Global *227 Minerals & Metals Corp. v. Superior Court (2003) 113 Cal.App.4th 836, 852, fn. 10 [7 Cal.Rptr.3d 28].[12]
We now answer that open question.

3. The Cartwright Act Requires That Plaintiffs Suffer a Compensable Injury

As quoted above, section 16750, subdivision (a) provides that "[a]ny person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor ... and ... recover three times the damages sustained by him or her...." Recovery for the antitrust plaintiff is three times the "damages sustained." What does that phrase mean?
(4) As we explained in MacIsaac v. Waste Management Collection & Recycling, Inc. (2005) 134 Cal.App.4th 1076 [36 Cal.Rptr.3d 650] (MacIsaac), the rules governing statutory construction in California are well established. "`[O]ur primary task is to determine the lawmakers' intent," which we are to do using a three-step process. (Id. at p. 1082.) We first "look to the words of the statute themselves. [Citations.] The Legislature's chosen language is the most reliable indicator of its intent because `"it is the language of the statute itself that has successfully braved the legislative gauntlet."' [Citation.] We give the words of the statute `a plain and commonsense meaning' unless the statute specifically defines the words to give them a special meaning. [Citations.] If the statutory language is clear and unambiguous, our task is at an end...." (Id. at pp. 1082-1083.)
(5) "When the plain meaning of the statute's text does not resolve the interpretive question, we must proceed to the second step of the inquiry." (MacIsaac, supra, 134 Cal.App.4th at p. 1083.) In this step, we "`may turn to rules or maxims of construction,'" and "[w]e may also look to a number of extrinsic aids, including the statute's legislative history, to assist us in our interpretation." (Ibid., fn. omitted.)
*228 (6) We then described the third step: "If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretive process. [Citation.] In this phase of the process, we apply `reason, practicality, and common sense to the language at hand.' [Citation.] Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation. [Citation.] Thus, `[i]n determining what the Legislature intended we are bound to consider not only the words used, but also other matters, "such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction." [Citation.]'" (MacIsaac, supra, 134 Cal.App.4th at p. 1084; accord, Day v. City of Fontana (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196]; Pacific Gas & Electric, supra, 16 Cal.4th 1143, 1152.)
(7) Consistent with these guidelines, we must first examine the language of section 16750 to ascertain whether it evidences an intent to allow plaintiffs to maintain a Cartwright Act case even though they themselves have sustained no injury. We conclude that the answer is "no." Put conversely, we hold that the pass-on defense is available to defendants and, as applied here, defeats plaintiffs who have passed on all the claimed overcharges. In the language of the Cartwright Act, plaintiffs have no "damages sustained."
The term "damages sustained" is not defined in the Cartwright Act. However, it is in other places and cases and, as will be seen, those authorities hold that the phrase refers to actual financial loss suffered. But two early California cases addressing the issue of damages in the context of the Cartwright Act also bear on the question, and we begin with discussion of those cases.
The first case is Krigbaum v. Sbarbaro (1913) 23 Cal.App. 427 [138 P. 364] (Krigbaum). Krigbaum, a real estate broker, filed an antitrust action against the stockholders of a bank, claiming that the defendants colluded to prevent him from acquiring certain property suitable for grape-growing, doing so, he alleged, so they could purchase the property themselves and secure a monopoly on the wine industry. (Id. at pp. 429-431.) The defendants demurred for failure to state a claim, which the trial court sustained. (Id. at p. 429.) The Court of Appeal affirmed, holding that the complaint did not state a cause of action under the Cartwright Act. (23 Cal.App. at p. 432.)
(8) The court reasoned that the plaintiff did not allege he suffered an injury as a result of a restraint in trade. At most, he alleged that he suffered an *229 injury as a result of the "wrongful acts" of the defendants, which does not constitute a cause of action under the Cartwright Act. Rather, the court explained, "To be `injured in business or property,' within the contemplation of [the Cartwright Act] .... is where the injury has directly resulted from the fact of the existence of the trustthat is to say, where the business or property has directly sustained injury solely by reason of the restrictions in trade or commerce which are fostered by such trust or combination. In other words, while one whose business or property has been injured solely because of the restrictions in trade carried out by a trust organized and maintained for that purpose may maintain an action under the provisions of the anti-trust law for double the damages he has actually suffered from the injury so inflicted, yet he could not maintain an action based upon said law if the injury, although directly the result of the wrongful acts of the trust or the constituent members thereof, did not arise by reason of the restrictions in trade or commerce carried out by such trust or combination." (Krigbaum, supra, 23 Cal.App. at p. 433.) Importantly for our purposes, the court recognized that recovery was only available for the damages the plaintiff actually suffered as a result of the antitrust violation.
The other case is Overland P. Co. v. Union L. Co. (1922) 57 Cal.App. 366 [207 P. 412] (Overland). The claim there was by a publishing company which alleged that a cartel of publishing companies known as the Printers' Board of Trade had violated the Cartwright Act by engaging in price fixing and bid rigging in the publishing market, thereby eliminating competition among the cartel's members. (57 Cal.App. at pp. 373-374.) Again, the trial court sustained a demurrer on the ground that the plaintiff did not allege it had been damaged within the meaning of the Cartwright Act. (57 Cal.App. at pp. 374-375.) We affirmed, holding that "If plaintiff could secure union labor and continue to operate its business, the activities of the Printers' Board of Trade in restricting competition among its own members would not injure plaintiff in the least. It is alleged that these practices have continued for three years. Apparently they have not injured plaintiff, but have probably meant to it a business opportunity.... [¶] Plaintiff cannot maintain an action against the Printers' Board of Trade because of these alleged practices without pleading and proving special damage to his business or property by reason thereof. There are no facts alleged in the complaint showing damage to plaintiff because of said defendant's methods of doing business." (Id. at p. 375.)
(9) Overland holds that an antitrust plaintiff must have "special damage." It also teaches that a plaintiff who benefits from the alleged collusion lacks a Cartwright Act cause of action. This is the situation here, where the result of the passing on of the claimed overcharges is that plaintiffs' gross profits are *230 higher. In sum, the only two Cartwright Act cases remotely addressing the issue demonstrate the plaintiffs' action has no merit.
CACI No. 3440, the Judicial Council of California Civil Jury Instruction on damages under the Cartwright Act, is instructive. It provides: "If you decide that [name of plaintiff] has proved [his/her/its] claim against [name of defendant], you also must decide how much money will reasonably compensate [name of plaintiff] for the harm. This compensation is called `damages.' [¶] The amount of damages must include an award for all harm that was caused by [name of defendant], even if the particular harm could not have been anticipated. [¶] [Name of plaintiff] must prove the amount of [his/her/its] damages.... [¶] The following are the specific items of damages claimed by [name of plaintiff]: [¶] 1. [Loss of reasonably anticipated sales and profits]; [¶] 2. [An increase in [name of plaintiff]'s expenses]; [¶] 3. [Insert other applicable item of damage]." This instruction clearly contemplates that the damages recoverable under the Cartwright Act are intended to compensate the injured plaintiff for actual monetary loss suffered.
Our conclusion finds further support in the cases applying the term "damages sustained" in contexts other than the Cartwright Act. Thus, for example, Carter v. Agricultural Ins. Co. (1968) 266 Cal.App.2d 805, 807 [72 Cal.Rptr. 462], where, construing "damages sustained" in suits brought under Code of Civil Procedure former section 539, the court interpreted the term to mean "those [damages] suffered by [the plaintiff], his actual damages, to compensate him for the losses he has endured." Likewise Scally v. W. T. Garratt & Co. (1909) 11 Cal.App. 138, 151 [104 P. 325], where, construing "damages sustained" in a jury instruction, the court stated that a plaintiff "could, manifestly, sustain such damages only as amounted to an actual loss to him." Two old Supreme Court cases are to the same effect: Utter v. Chapman (1869) 38 Cal. 659, 663 [absent fraud, "it is always the aim of the Court to give damages, and such damages only as will compensate the plaintiff for his loss ..."]; and De Costa v. Mass. Mining Co. (1861) 17 Cal. 613, 617 [plaintiff "could not recover beyond the injury sustained"].) While these cases do not involve antitrust claims or the Cartwright Act, nothing there, or elsewhere, suggests that the Legislature intended the phrase "damages sustained" to mean something different in the antitrust context.
Numerous other statutes employ the phrase "damages sustained." (See, e.g., §§7160, 10167.10, subd. (e), 16804, 18413, subd. (a); Civ. Code, §§798.29.5, 883.140, subd. (c), 1710.1, 1786.50, subd. (a)(1), 1798.48, 1812.31, subd. (a).) We are unaware of any authorityand plaintiffs have not identified anyinterpreting any of those statutes in a manner that allowed for *231 the recovery of monetary compensation beyond the actual financial loss suffered by a plaintiff. And we can discern nothing suggesting that the term means something different in the antitrust context. As Judge Sabraw put it: "If the Legislature had intended to depart in section 16750 from the usual meaning of `damages sustained,' then it probably would have used different words. The Legislature did not, for example, state that a plaintiff can recover `three times any excess price paid....'"
Plaintiffs attempt to distinguish the above authorities on a variety of grounds. They argue Krigbaum, supra, 23 Cal.App. 427, and Overland, supra, 57 Cal.App. 366, are unpersuasive because neither case interpreted the phrase "damages sustained." They object to reliance on non-Cartwright Act cases, complaining that as contract or tort actions they do not take into account the act's "three-pronged policy objective." They take exception to consideration of the phrase "damages sustained" in other statutes, claiming that it violates principles of statutory construction. And they criticize any reliance on cases that postdate the enactment of the Cartwright Act, deeming it "implausible" that such cases influenced the drafters of the Cartwright Act. None of these arguments is convincing.
(10) It is true that Krigbaum, supra, 23 Cal.App. 427, and Overland, supra, 57 Cal.App. 366, did not expressly construe "damages sustained." But neither did Hanover Shoe. As to the "three-pronged policy objective" argument, the "primary" purpose of private antitrust actions is compensation. (Bruno v. Superior Court, supra, 127 Cal.App.3d at p. 132.) Plaintiffs who have passed on all overcharges and suffered no financial loss themselves have nothing that merits compensation. And as to the consideration of the phrase in other settings, the language in Torres v. Parkhouse Tire Service, Inc. (2001) 26 Cal.4th 995, 1005 [111 Cal.Rptr.2d 564, 30 P.3d 57] is particularly apt: "`"[W]hen words used in a statute have acquired a settled meaning through judicial interpretation, the words should be given the same meaning when used in another statute dealing with an analogous subject matter...."'" (Accord, Mercer v. Department of Motor Vehicles (1991) 53 Cal.3d 753, 763 [280 Cal.Rptr. 745, 809 P.2d 404].)
Plaintiffs raise one final argument to attempt to dissuade us from holding that the language of section 16750 means what it says. Relying on Hughes v. Board of Architectural Examiners (1998) 17 Cal.4th 763, 776 [72 Cal.Rptr.2d 624, 952 P.2d 641] for the proposition that "[a] statute is regarded as ambiguous if it is capable of two constructions, both of which are reasonable," plaintiffs argue that the United States Supreme Court in Hanover Shoe and Judge Sabraw here construed "virtually identical" language yet arrived at *232 contradictory conclusions. As plaintiffs frame it: "The former read the language as excluding the pass-on defense; whereas the latter interpreted the statute as permitting it. For the language to be considered ambiguous, both readings must be `reasonable.' The United States Supreme Court's reading must be considered at least `reasonable,' given it has affirmed the reasoning on three separate occasions over the past four decades." Plaintiffs' argument is unsound for several reasons.
First, the Supreme Court did not decide Hanover Shoe based on the language of section 4 of the Clayton Act. Nowhere does Justice White analyze the phrase "damages sustained." Nowhere does he even note, much less determine, that the language was intended to include any amount the plaintiff was overcharged even if the full amount was passed on to a subsequent purchaser. Instead, the Supreme Court based its holding on concerns over "nearly insuperable" problems of proof as well as concerns that indirect purchasers would lack incentive to sue if the pass-on defense were recognized. (Hanover Shoe, supra, 392 U.S. at pp. 492-494.) In re Western Liquid Asphalt Cases (9th Cir. 1973) 487 F.2d 191, 199 (Liquid Asphalt), a case cited numerous times by plaintiffs, confirms this point, observing as follows: "We do not believe that the Supreme Court [in Hanover Shoe, supra, 392 U.S. 481] intended a per se rule with respect to passing on.... The Court was applying policy to a specific case."
Language in Kansas v. UtiliCorp. United Inc. (1990) 497 U.S. 199 [111 L.Ed.2d 169, 110 S.Ct. 2807] (UtiliCorp.), another case heavily relied on by plaintiffs, albeit only in reply, also bears on this issueand not favorably to plaintiffs. In UtiliCorp, the Court of Appeals considered the following certified question: "`In a private antitrust action under 15 U. S. C. § 15 involving claims of price fixing against the producers of natural gas, is a State a proper plaintiff as parens patriae for its citizens who paid inflated prices for natural gas, when the lawsuit already includes as plaintiffs those public utilities who paid the inflated prices upon direct purchase from the producers and who subsequently passed on most or all of the price increase to the citizens of the State?'" (Id. at pp. 205-206.) In other words, could the state bring a parens patriae action on behalf of indirect purchasers? The Court of Appeals answered this question in the negative. The Supreme Court affirmed. (Id. at p. 206.)
One of the arguments asserted by the plaintiffs was that the court "should apply an exception ... for actions based upon cost-plus contracts." (UtiliCorp., supra, 497 U.S. at pp. 207-208.) While the court ultimately declined to do so under the particular facts before it, it did acknowledge that *233 Illinois Brick and Hanover Shoe allowed for a departure from the rule forbidding the assertion of the pass-on theory in certain circumstances. As the court hypothesized, it "might allow indirect purchasers to sue only when ... the direct purchaser will bear no portion of the overcharge and otherwise suffer no injury." (Id. at pp. 218.)
But most significant, and most worthy of comment here, are three comments in the dissent of Justice White, the author of Hanover Shoe and the Illinois Brick majority opinion. Urging that the indirect purchaser states should be allowed to sue, Justice White noted as follows:
(1) "[A]lthough the utility could sue to recover lost profits resulting from lost sales due to the illegally high price, its injury is not measured by the amount of the illegal overcharge that it has passed on, and hence the utility would have no incentive to seek such a recovery." (UtiliCorp., supra, 497 U.S. at p. 224 (dis. opn. of White, J.).)
(2) "Given a passthrough, the customer, not the utility, suffers the antitrust injury, and it is the customer or the State on his behalf that is entitled to recover treble damages." (UtiliCorp., supra, 497 U.S. at p. 224 (dis. opn. of White, J.).)
(3) "Again however, where there is a `perfect and provable' passthrough, there is no danger that both the utilities and the indirect purchasers will recover damages for the same anticompetitive conduct because the utilities have not suffered any overcharge damage: The petitioners will sue for the amount of the overcharge, while the utilities will sue for damages resulting from their lost sales." (UtiliCorp., supra, 497 U.S. at pp. 224-225 (dis. opn. of White, J.).)
We read these comments to suggest that Justice White himself would rule against plaintiffs. It was the indirect purchaser which "suffers the antitrust injury." By contrast, the utility could only sue for "damages resulting from their lost sales"; its injury is "not measured by the amount of the illegal overcharge that it has passed on." (UtiliCorp., supra, 497 U.S. at p. 224 (dis. opn. of White, J.).) Substitute "pharmacies" for "utilities" and the author of Hanover Shoe devastates plaintiffs here: their injury "is not measured by the amount of the illegal overcharge [they have] passed on." (Ibid.)
Second, the United States Supreme Court has confirmed that Hanover Shoe and Illinois Brick were interpreting federal, not state, law. In California v. ARC America Corp. (1989) 490 U.S. 93, 102-103 [104 L.Ed.2d 86, 109 S.Ct. 1661] (ARC America), again a unanimous opinion by Justice White, the court explained: "As we made clear in Illinois Brick, the issue before the Court in *234 both that case and in Hanover Shoe was strictly a question of statutory interpretationwhat was the proper construction of § 4 of the Clayton Act.... [¶] It is one thing to consider the congressional policies identified in Illinois Brick and Hanover Shoe in defining what sort of recovery federal antitrust law authorizes; it is something altogether different, and in our view inappropriate, to consider them as defining what federal law allows States to do under their own antitrust law." (Citation omitted.)
Also enlightening on this point are the briefs submitted on behalf of the State of California in ARC America, where Attorney General Van de Kamp expressed the view that the pass-on defense is recognized in California. For example, in appellants' opening brief, he is quoted as stating, "[R]ecovery under states' laws is determined by actual injury." (Brief of Appellant States, ARC America [No. 87-1862], 1988 U.S. S.Ct. Briefs Lexis 736, at p. *59.) And in reply, that "a state plaintiff is not authorized to recover for the injuries sustained by another...." (Reply Brief of Appellant States, ARC America [No. 87-1862], 1989 U.S. S.Ct. Briefs Lexis 1452, at p. *21.) So, too, is the conclusion of the author of the law review article cited by our Supreme Court in Union Carbide, supra, 36 Cal.3d 15, 20, that the pass-on defense is available in California. (See Comment, The California Legislature Steers the Antitrust Cart Right Off the Illinois Brick Road (1979) 11 Pac. L.J. 121, 137-138.)
Finally, Hanover Shoe relied on cases applying a privity rule that precluded indirect purchasers suits. (See Hanover Shoe, supra, 392 U.S. at pp. 489-490, citing Southern Pac. Co. v. Darnell-Taenzer Co. (1918) 245 U.S. 531, 533-534 [62 L.Ed. 451, 38 S.Ct. 186].) In enacting the Illinois Shoe repealer statute, the California Legislature confirmed in no uncertain terms that indirect purchaser suits are permissible in California.
(11) We conclude this discussion with the observation that to allow plaintiffs to recover here would violate a fundamental precept of California damage lawthat plaintiffs not receive a windfall. As one Court of Appeal put it long ago, the "fundamental principle of the law of damages" is that a plaintiff cannot "hold a defendant liable ... for more than the actual loss which he has inflicted by his wrong." (Avery v. Fredericksen and Westbrook (1944) 67 Cal.App.2d 334, 336 [154 P.2d 41]; see generally Privette v. Superior Court (1993) 5 Cal.4th 689, 699-700 [21 Cal.Rptr.2d 72, 854 P.2d 721] [allowing employee plaintiffs to recover from multiple sources for the same injury would result in "unwarranted windfall"].)[13]
*235 (12) In sum, the language of the Cartwright Act, all relevant case law, and all relevant statutes lead us to conclude that "three times the damages sustained" as used in section 16750 refers to actual monetary loss suffered by plaintiffs. Plaintiffs suffered no such loss, as the claimed overcharges were passed on, a pass-on that defeats plaintiffs here. In the language of the issue as framed by the parties, the pass-on defense is available in California.
In light of the result we reach, we perhaps need not engage in any further level of statutory interpretation. (MacIsaac, supra, 134 Cal.App.4th at p. 1083.) But because the parties devote substantial portions of their briefs to the subject, we choose to address it and conclude that neither plaintiffs' extensive citation to legislative history nor their reliance on public policy supports any different conclusion.

4. Neither Legislative History Nor Public Policy Demonstrates That Hanover Shoe Is the Law in California

a. Legislative History

Plaintiff's primary argument, to which they devote some 13 pages in their opening brief and 12 in their reply, is that Judge Sabraw "erred by failing to interpret the intent of the Legislature." Their positionthat Hanover Shoe is the law in Californiarelies on the fundamental premise that the legislative history demonstrates a recognition by the Legislature of the risk of multiple liability. In plaintiffs' words, this risk "necessarily presumes the recognition of Hanover Shoe. If Hanover Shoe were not the law, the danger [of multiple liability] would simply not exist."
In arguing that the legislative history supports their construction of section 16750, plaintiffs focus primarily on three distinct aspects of such history: the 1976 Hart-Scott-Rodino Act and the 1977 California equivalent, the 1978 Illinois Brick repealer amendment, and the California Attorney General's amicus curiae brief in Illinois Brick.
In 1976, Congress passed the Hart-Scott-Rodino Act, an amendment to the federal antitrust statutes which authorized parens patriae[14] suits by state *236 attorneys general on behalf of citizens injured by anticompetitive conduct. A provision of the amendment read, "The court shall exclude from the amount of monetary relief awarded in such action any amount of monetary relief (A) which duplicates amounts which have been awarded for the same injury, or (B) which is properly allocable to (i) natural persons who have excluded their claims pursuant to subsection (b)(2) of this section, and (ii) any business entity." (15 U.S.C. § 15c(a)(1).)
The Hart-Scott-Rodino Act included a provision to protect defendants from multiple liability in antitrust overcharge cases. As summarized in the Senate Committee on Judiciary report, the amendment "contains a proviso to assure that defendants are not subjected to duplicative liability, particularly in a chain-of-distribution situation where it is claimed that middlemen absorbed all or part of the illegal overcharge. The Committee intention is to codify the holding of the 9th Circuit in [Liquid Asphalt] 487 F.2d 191 (9th Cir. 1973)."[15]
Representative Rodino, the bill's sponsor in the House of Representatives, expressed a similar intent: "[T]he courts that have required privity between the plaintiff and the defendant as a prerequisite to standing [i.e., the Donson view], have generally done so, because they have misread the Supreme Court's Hanover Shoe opinion, 392 U.S. 481 (1968). Fearing that the first purchaser can, under Hanover Shoe, recover the entire overcharge, whether or not he absorbs all or merely part of it, these courts have clearly been motivated by the specter of double liability raised by successful actions by subsequent purchasers. However, the compromise billunlike the House billexpressly forbids duplicative recovery."
From these legislative comments, plaintiffs conclude that "Congress' passage of the Hart-Scott-Rodino Act included (1) the intent to preserve the Hanover Shoe rule, (2) the intent to codify Liquid Asphalt's solution to the multiple recovery problem, and (3) the intent to allow standing to indirect purchasers."
The following year, the California Legislature passed Assembly Bill No. 1162 (1977-1978 Reg. Sess.) (Assem. Bill 1162) which, according to the bill digest, was "modeled directly on federal law." The bill codified the Hart-Scott-Rodino Act as California law, incorporating a parens patriae provision into the Cartwright Act. (§ 16760.)[16] The provision included language that was substantively identical to the Hart-Scott-Rodino Act's prohibition against duplicate recovery. (Cf., § 16760, subd. (a)(1) and 15 U.S.C. *237 § 15c(a)(1).) The Assembly Bill Analysis confirmed that "AB 1162 would enact into law basically the same provisions enacted into federal law last year by the [C]ongress." Plaintiffs also identify various writings suggesting Assem. Bill 1162 was intended to parallel the Hart-Scott-Rodino Act, including letters from the Los Angeles and San Diego County District Attorneys.
According to plaintiffs, the foregoing establishes that (1) the Legislature intended Assem. Bill 1162 to bring California law into line with the federal statute, (2) the federal statute was enacted to address the possibility of multiple liability, and (3) multiple liability can only occur if the pass-on defense is not permitted. Ergo, plaintiffs conclude, in passing Assem. Bill 1162 the California Legislature implicitly recognized Hanover Shoe as the law in California. We are not persuaded.
First, and as Judge Sabraw observed, if the Legislature was in fact concerned with the threat of multiple liability, logically it would have included a safeguard against double recovery in section 16750 as well as in the parens patriae provision. Since it did not, one can reasonably conclude that it did not consider multiple liability in private actions a problem because the pass-on defense is available to defendants.
Moreover, the safeguard against multiple liability in the parens patriae provision undermines plaintiffs' claim that the provision necessarily assumes the nonexistence of the pass-on defense. As defendants put it, "the multiple liability provision applies more logically where the Attorney General purports to bring suit on behalf of end-users (as to whom a pass-on defense would never be available), or other natural persons, who have already recovered for their injuries through different litigation or settlementas, for example, through a consumer class action. When the Attorney General subsequently sues under the parens patriae statute on behalf of all natural persons in California, the Attorney General cannot recover a second time those portions of an overcharge that were already awarded as damages."
We cannot conclude that the legislative history of Assem. Bill 1162 clearly demonstrates the Legislature's intent to reject the pass-on defense in California. Nor does the legislative history of Assembly Bill No. 3222 (1977-1978 Reg. Sess.) (Assem. Bill 3222), the 1978 Illinois Brick repealer amendment.
According to plaintiffs, in passing the Illinois Brick repealer amendment, thereby clarifying that indirect purchasers have standing in California, "the Legislature intended to `repeal' the Illinois Brick majority opinion" and to *238 adopt the Illinois Brick dissent in its entirety. This argument derives in part from the bill synopsis prepared by the Senate Committee on the Judiciary, which states, "The purpose of the bill is to prevent a federal case interpretation of the Sherman Act ... from being applied to actions under the Cartwright Act"; and in part from the bill digest prepared by the Assembly Committee on the Judiciary. Plaintiffs argue that this suggests the Legislature's intent to incorporate the Illinois Brick dissent in its entirety, which includes recognition of Hanover Shoe. To bolster such assertion, plaintiffs point to the majority opinion in Illinois Brick, 431 U.S. at pages 729-730, footnote 10, which describes the dissenting view as the same view advocated by the State of California in its amicus curiae brief in Illinois Brick. And from this plaintiffs reason that "[i]f Justice Brennan's dissent accurately reflects California's position, then it must be concluded that California does not recognize the pass-on defense" since the justice expressly stated that "Hanover Shoe ... can and should be limited to cases of defensive assertion of the passing-on defense to antitrust liability, where direct and indirect purchasers are not parties in the same action." (Illinois Brick, supra, 431 U.S. at p. 753.)
Defendants respond with their own numerous excerpts from the legislative history, including from the Senate Committee on the Judiciary analysis; from the bill digest of the Senate Committee on the Judiciary; from the history of Assem. Bill 3222 in the Senate Committee on the Judiciary; from a memorandum of the Senate Democratic Caucus; and from a bill analysis for the Governor's office. From that, defendants urge that the sole purpose of the amendment was to "ensure that the California courts did not apply the holding of [Illinois Brick]that indirect purchasers could not sue under the federal antitrust lawsto the Cartwright Act."
We agree with defendants, and conclude that these passages show that passage of Assem. Bill 3222 was intended simply to codify standing for indirect purchasers under the Cartwright Act, rather than as an adoption of the Illinois Brick dissent in its entirety. Indeed, and as defendants point out, if "Hanover Shoe automatically and tacitly became California law in 1968 ... then Illinois Brick's rule against indirect purchaser suits likewise became the law as soon as the Supreme Court issued its decision in that case. But if that were so, the 1978 Amendment could not have been `declaratory of existing law as the Legislature stated, and instead would have altered existing law by overruling Illinois Brick in California."
We end our discussion of legislative history with the observation that, however vigorous plaintiffs' presentation, it necessarily concedes that any adoption of Hanover Shoe was by implication. As plaintiffs candidly put it at one point, the legislative history manifests "a tacit approval" of the rule of *239 Hanover Shoe. Such concession is appropriate, as one thing is clear: not once in the numerous pages of legislative history on which plaintiffs rely is Hanover Shoe even mentioned. Such fact militates strongly against plaintiffs, as we recently observed in State Building & Construction Trades Council of California v. Duncan (2008) 162 Cal.App.4th 289, 323 [76 Cal.Rptr.3d 507]: "At the federal level, the United States Supreme Court has observed that `"Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisionsit does not, one might say, hide elephants in mouseholes." (Whitman v. American Trucking Assns. [(2001)] 531 U.S. 457, 468 [149 L.Ed.2d 1, 121 S.Ct. 903] ...; see FDA v. Brown & Williamson Tobacco Corp. [(2000)] 529 U.S. 120, 160 [146 L.Ed.2d 121, 120 S.Ct. 1291] ... ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance... in so cryptic a fashion").' (Gonzales v. Oregon (2006) 546 U.S. 243, 267 [163 L.Ed.2d 748, 126 S.Ct. 904].) California courts have adopted a similar skepticism. (Garcia v. McCutchen (1997) 16 Cal.4th 469, 482 [66 Cal.Rptr.2d 319, 940 P.2d 906]; In re Christian S. (1994) 7 Cal.4th 768, 782 [30 Cal.Rptr.2d 33, 872 P.2d 574]; Ailanto Properties, Inc. v. City of Half Moon Bay (2006) 142 Cal.App.4th 572, 589 [48 Cal.Rptr.3d 340]; Pleasant Hill Bayshore Disposal, Inc. v. Chip-It Recycling, Inc. (2001) 91 Cal.App.4th 678, 680, fn. 7 [110 Cal.Rptr.2d 708].)"
Finally, plaintiffs rely on Union Carbide, supra, 36 Cal.3d 15 to support their position that the 1978 amendment reflected the Legislature's claimed adoption of the Illinois Brick dissenting opinion in its entirety, including recognition of Hanover Shoe. Such reliance is misplaced.
The plaintiffs in Union Carbide were indirect purchasers of industrial gas and alleged that the defendants, producers of industrial gas, "conspired to fix prices of the gas, causing plaintiffs to pay more for it than they would have paid in the absence of the conspiracy." (Union Carbide, supra, 36 Cal.3d at p. 19.) As pertinent here, the defendants "demurred to the complaint, claiming a defect of parties (Code Civ. Proc., §430.10, subd. (d); see § 430.30, subd. (a)) and moved to dismiss under section 389 for absence of indispensable parties." (Ibid., fn. omitted.) The trial court overruled the demurrer and denied the motion.
The defendants petitioned for a writ of mandate ordering the plaintiffs to join all persons in the chain of distribution between the plaintiffs and the defendants, arguing that the absence of such parties subjected them to multiple liability. (Union Carbide, supra, 36 Cal.3d at pp. 18-20.) This argument was driven by the existence of a federal action in Illinois brought by residents of states other than California, who alleged that they purchased gas directly from the defendants and were injured by the same price fixing *240 misconduct at issue in the California case. (Id. at p. 20.) The defendants also expressed concern that other indirect purchasers in California not involved in the suit "would create a substantial risk of multiple liability because the intermediate purchasers might independently sue petitioners under the Cartwright Act, contending that they absorbed, rather than passing on to the present plaintiffs, all or part of the overcharges for which plaintiffs now seek damages." (Id. at p. 21.)
The Supreme Court denied the writ, noting that it was raised at the pleading stage, where the operative papers included only the plaintiffs' complaint, the complaint in the Illinois federal case, and proceedings regarding class certification in the federal case. (Union Carbide, supra, 36 Cal.3d at p. 22.) These papers, according to the Supreme Court, did not "demonstrate a substantial risk of multiple liability sufficient to require that additional parties be joined in the complaint (or named therein with sufficient reasons for nonjoinder) as a prerequisite to [defendants'] being required to answer the complaint in order to avoid default." (Id. at p. 22.) The court continued, however: "We do not foreclose the possibility that through discovery or other means petitioners may be able later to make a showing of substantial risk of multiple liability that would entitle them to a joinder order." (Id. at p. 24.)
Citing one paragraph in Union Carbidea paragraph of dictum, no lessplaintiffs argue that "the Union Carbide court adopted the view of the dissent in Illinois Brick that the risk of multiple liability was remote and that it could in any event be addressed through existing procedural mechanisms [¶] ... [¶] [and] the fact that the Supreme Court recognized that a danger of multiple liability could exist in any situation at all (albeit remote and procedurally ameliorated) necessarily presumes the recognition of Hanover Shoe."[17] Hardly.
To begin with, the issue in Union Carbide was one of joinder, not the pass-on defense. Moreover, the opinion begins by describing precisely which part of the Illinois Brick dissenting opinion the Legislature had approved in the 1978 amendment to the Cartwright Act, "that indirect purchasers are persons `injured' by illegal overcharges passed on to them in the chain of distribution." (Union Carbide, supra, 36 Cal.3d at p. 20.) Nothing in Union *241 Carbide supports the contention that the 1978 amendment included codification of Hanover Shoewhich, not incidentally, is not even mentioned in the majority opinion.
In sum, the legislative history does not establish the Legislature's intent to adopt Hanover Shoe's rejection of the pass-on defense. Nor does the public policy argued by plaintiffs.

b. Public Policy

Plaintiffs vigorously argue that public policy concerns mandate adherence to Hanover Shoe, asserting first that "California policy requires that `offensive' and `defensive' pass-on be treated differently." This is so, plaintiffs argue, because "[a]llowing indirect purchaser plaintiffs to use offensive pass-on adds an additional group of plaintiffs to an existing lawsuit, or it allows an antitrust violation to be redressed. Both of these situations are consistent with California's strong stated policy in favor of enforcing the antitrust laws. On the other hand, allowing defendants to assert an affirmative pass-on defense runs contrary to that policy, giving rise to the danger that no plaintiff will be able to sue a defendant, even where it has confessed to wrongdoing."
(13) Plaintiff's argument ignores the principle which calls for the equal treatment of claims and defenses, a principle fundamental to the holding in Illinois Brick, supra, 431 U.S. at p. 728: "[W]hatever rule is to be adopted regarding pass-on in antitrust damages actions, it must apply equally to plaintiffs and defendants." This rule, called the "golden rule" by Judge Sabraw, finds support in California law, illustrated, for example, by Civil Code section 1717, which provides that in an action based on a contract containing a provision that affords attorney fees and costs to one party to the action, the prevailing party is entitled to reasonable attorney fees whether or not he or she is specified in the contract.
Plaintiffs' second public policy argument is that "where the choice is between a windfall to plaintiffs and letting guilty defendants go free, liability must be imposed." As plaintiffs describe it, they "were involuntarily subjected to an illegal price-fixing agreement that forced them to pay more than they should have; [defendants] masterminded this unlawful scheme and now seek to escape liability with their illegal profits intact." This result, plaintiffs submit, is "expressly forbid[den]" by California policy.
Citing nothing in support of the adjective "expressly," plaintiffs go on to discuss the deterrent and disgorgement purposes of actions under the Cartwright Act as recognized in Bruno v. Superior Court, supra, 127 *242 Cal.App.3d at p. 132. And while deterrence and disgorgement are no doubt significant considerations, plaintiffs' argument ignores the fact that "compensation is the primary rationale for the allowance of private antitrust lawsuits...." (Bruno, supra, 127 Cal.App.3d at p. 132.) In essence, plaintiffs' reading of Bruno stands the case on its head, placing the goal of deterrence above that of compensation, despite Bruno's express language to the contrary.
Furthermore, overlooked by plaintiffs is the fact that they themselves have already been paid for the claimed overcharges, so any recovery of the overcharges from defendantsnot to mention treble recoverywould be a windfall to plaintiffs. In other words, whether a windfall is to be tolerated apparently turns on who receives it. Finally, we cannot help but note that the only thing that would keep plaintiffs from having "damages sustained" is that they have passed on all the claimed overcharges. A plaintiff who passed on only some of these charges would maintain "damages" for which it could state a Cartwright Act claim.
Plaintiffs also argue that recognizing the pass-on defense will deprive plaintiffs of incentive to sue for an antitrust violation, claiming that the "availability of the pass-on defense would virtually wipe-out all but endconsumer overcharge cases." Maybe it will deprive plaintiffs of incentive, at least in the circumstances here, but those with damages have incentive indeed. The Cartwright Act itself provides ample incentive, in the form of treble damages, prejudgment interest, attorney fees, and costs. There is, in addition, the parens patriae provision, which authorizes the government to bring enforcement actions on behalf of private individuals who may lack incentive to bring a lawsuit to obtain compensation for their individual injuries.
To the extent that plaintiffs' argument intimates that recognition of the pass-on defense may discourage lawsuits by indirect purchasers because of the amount of damages, such is belied empirically. We saw this firsthand in the consolidated class action cases in In re Vitamin Cases (2003) 110 Cal.App.4th 1041, 1046 [2 Cal.Rptr.3d 358] (class of indirect purchasers of vitamins; total settlement of $80 million). Other courts have seen it, too, as in In re Microsoft I-V Cases (2006) 135 Cal.App.4th 706, 710 [37 Cal.Rptr.3d 660] (two classes of indirect acquirers of licenses; "billion-dollar settlement agreement") and In re Natural Gas Antitrust Cases (2006) 137 Cal.App.4th 387, 390-391 [39 Cal.Rptr.3d 909] (seven coordinated class action lawsuits; settlement of $1.55 billion).
(14) For each and all of the above reasons, we conclude that Hanover Shoe is not the law in California. But even if it were, plaintiffs would still lose, based on Hanover Shoe itself.

*243 5. Even Assuming Hanover Shoe Were the Law in California, the Pass-on Defense Is Available in the Setting Here

As discussed above, Hanover Shoe did not establish an absolute bar to the assertion of the pass-on defense. To the contrary, the Supreme Court recognized "that there might be situationsfor instance, when an overcharged buyer has a pre-existing `cost-plus' contract, thus making it easy to prove that he has not been damagedwhere the considerations requiring that the passing-on defense not be permitted in this case would not be present." (Hanover Shoe, supra, 392 U.S. at p. 494.) This, we conclude, is one such situation.
While the contracts between plaintiffs and their customers were perhaps not true cost-plus contracts, they were certainly analogous. Moreover, and unlike Hanover Shoe, this is not a "particularly complicated problem with respect to the pass-on issue." (B.W.I. Custom Kitchen, supra, 191 Cal.App.3d 1341, 1352.) While plaintiffs certainly resisted discovery on various grounds, Judge Sabraw specifically found that plaintiffs had not shown it was unduly burdensome or oppressive for them to produce data regarding purchases and sales of drugs, since the information was maintained electronically and could apparently be extracted and compiled with relative ease.
Again, UtiliCorp. is persuasive. As distilled above, the issue there was whether the state could bring a parens patriae action on behalf of the indirect purchasers of natural gas. And one of plaintiff's arguments was that the court "should apply an exception, suggested in Illinois Brick, for actions based upon cost-plus contracts." (UtiliCorp., supra, 497 U.S. at pp. 207-208.) While the court ultimately declined to do so under the particular facts there, it acknowledged that Illinois Brick and Hanover Shoe allowed for a departure from the rule forbidding the assertion of the pass-on theory in certain circumstances: that it "might allow indirect purchasers to sue only when ... the direct purchaser will bear no portion of the overcharge and otherwise suffer no injury." (UtiliCorp., at p. 218.) This, of course, is the situation here.
The case here is as neat and clear a setting as recognized in Hanover Shoe and in UtiliCorp, where an exception should apply. Indeed, a clearer scenario of a "`perfect and provable' pass-through," as Justice White described it, is difficult to imagine. The undisputed facts established that plaintiffs passed the alleged overcharges in their entirety to their customers. They admitted that. They also admitted that they do not seek damages for any other loss, such as lost or delayed sales or any other diminution in business or profits. And all this was apparently easily developed in discovery.
As early as 1978 commentators were noting the significance and utility of the computer in antitrust litigation. (See, for example, Board of Editors of the *244 Federal Judicial Center, Manual for Complex Litigation (1978) § 2.717, p. 80.) The technological developments in the ensuing 30 years can hardly be described. Suffice to say that the ease with which computers can gather and distill data has ameliorated, if not eliminated, the "nearly insuperable" proof problems presented in the circumstancesand at the timeof Hanover Shoe.
In their motion below, plaintiffs acknowledged Hanover Shoe's "cost-plus" contract exception to the rejection of the pass-on defense, but argued that it did not apply here because the contract between plaintiffs and their customers was not a "cost-plus" contract. As we have said, maybe it is not, but it is the next best thing. In any event, plaintiffs construe Hanover Shoe too narrowly, as the case does not state that a "cost-plus" contract is the only exception allowing the pass-on defense; rather, a "cost-plus" contract was an "instance" of "situations" where the concerns compelling the rejection of the pass-on defense would not be present. (Hanover Shoe, supra, 392 U.S. at p. 494.) This is such an instance.

6. The UCL Claim Has No Merit

(15) In addition to their Cartwright Act claim, plaintiffs also alleged that defendants committed illegal business practices in violation of the Unfair Competition Law (UCL) (§ 17200 et seq.), which defines unfair competition to include "any unlawful, unfair or fraudulent business act or practice...." (§ 17200.)
Defendants moved for summary adjudication on this claim on two different grounds. First, they argued plaintiffs were not eligible for restitution, the sole monetary remedy available to private plaintiffs under the UCL, because they did not have an ownership interest in any monies defendants wrongfully obtained from the overcharges. Defendants also argued plaintiffs lacked standing under section 17204 because they did not lose money or property as required by that section.
Granting summary adjudication, Judge Sabraw first addressed the standing argument, concluding that plaintiffs lacked standing because they had not "lost money or property." Alternatively, he concluded that the court could not "award monetary relief under section 17203 because [p]laintiffs do not have an ownership interest in whatever funds they paid as a result of any overcharge" and were therefore not eligible for restitution. We agree on both counts, but address the issues in reverse order, as briefed by the parties.
Section 17203 provides: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, *245 including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."
(16) The exclusive monetary remedy available to private plaintiffs under the UCL is restitution. (§ 17203; Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4th 1134, 1144 [131 Cal.Rptr.2d 29, 63 P.3d 937] (Korea Supply); Madrid v. Perot Systems Corp. (2005) 130 Cal.App.4th 440 [30 Cal.Rptr.3d 210] (Madrid); Industrial Indemnity Co. v. Superior Court (1989) 209 Cal.App.3d 1093, 1095-1096 [257 Cal.Rptr. 655].) (17) Madrid provides particular insight into the meaning of "restitution" in the context of the UCL: "`Restitution' is an ambiguous term, sometimes referring to the disgorging of something that has been taken and sometimes referring to compensation for injury done. [Citation.] However, in the context of the UCL, `restitution' is limited to the return of property or funds in which the plaintiff has an ownership interest (or is claiming through someone with an ownership interest). [Citation.] [¶] Thus, the California Supreme Court has defined a UCL order for restitution as one `"compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." [Citation.]' [Citation.] `Restitution' under the UCL is not limited to money that was once in the plaintiff's possession but also includes money in which the plaintiff had a vested interest. [Citation.]" (Madrid, at p. 453.)
Plaintiffs suggest that the overcharges at issue here fall within the meaning of restitution because there is no dispute that the overcharge was originally in their possession. They argue that "[i]f a defendant violates the law and extracts an overcharge from a plaintiff, it is taking `money that was once in his possession,' which must be restored." Plaintiffs then submit that "no California authority hold[s] that restitution awards must be lessened to the degree they were mitigated." Plaintiffs are wrong. Madrid is dispositive.
Plaintiff Madrid, a customer of an electric company, filed a class action on behalf of electricity customers against various entities involved in restructuring the electricity market, alleging among other things UCL violations. Madrid sought recovery of "`restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful or unfair business act or practice'"; he also sought equitable and injunctive relief, alleging that "[d]efendants' unfair and unlawful business practices include conspiring to establish phoney strategies designed to `game' the *246 California markets." (Madrid, supra, 130 Cal.App.4th at pp. 449, 445.) The defendants demurred, and the trial court sustained the demurrer without leave to amend.
Madrid appealed, addressing only his UCL claim, arguing that "`[r]estitution is measured by defendants' wrongful gain, not [plaintiff]'s loss (i.e., overcharges). Thus, the focus of restitution is on defendants' unjust enrichment. Restitution simply returns that which defendants obtained from [plaintiff] as a result of their wrongful conduct. That remedy is measured by the defendants' gain, not [plaintiff]'s loss.'" (Madrid, supra, 130 Cal.App.4th at pp. 448, 450, 454.) The Court of Appeal expressly rejected Madrid's attempt to define restitution in terms of the amount gained by the defendants, rather than the loss suffered by him: "Although this restitution serves to thwart the wrongdoer's unjust enrichment, courts ordering restitution under the UCL `are not concerned with restoring the violator to the status quo ante. The focus instead is on the victim.'" (Id. at p. 455, quoting People ex rel. Kennedy v. Beaumont Investment, Ltd. (2003) 111 Cal.App.4th 102, 134-135 [3 Cal.Rptr.3d 429].)
Plaintiffs' argument here is in different words the same argument rejected in Madrid. We also reject it.
(18) Likewise persuasive is the comment in the Restatement of Restitution. As the authors there put it, "[a] person under a duty of restitution to another is discharged from his liability to the other for the restitution of the subject matter or its value if subsequent to his receipt of the subject matter (a) the other transfers his entire interest therein to a third person." (Rest., Restitution, § 141(2), p. 564.) Once plaintiffs resold defendants' products, and thereby recovered all of their costs, plaintiffs relinquished any ownership interest in the claimed overchargesand forfeited any possible UCL claim. (See Woodward, "Passing-on" the Right to Restitution (1985) 39 U.Miami L.Rev. 873.)
Shersher v. Superior Court (2007) 154 Cal.App.4th 1491 [65 Cal.Rptr.3d 634], the authority cited by plaintiffs after briefing was completed, is not to the contrary. There, a purchaser of a wireless product manufactured by Microsoft Corporation and purchased at a retail store sued Microsoft for, among other things, violations of the UCL. Microsoft moved to strike the restitution claim, arguing that only direct purchasers could assert a UCL claim. The trial court granted the motion, concluding that "the availability of restitution under the UCL was limited to direct purchasers and excluded plaintiffs such as the [consumer] in this case, who purchased Microsoft's *247 product from a retailer." (154 Cal.App.4th at p. 1494.) The Court of Appeal issued a writ of mandate ordering the trial court to vacate its order granting the motion to strike, concluding that the recovery of restitution was not conditioned on the customer having made direct payments to the manufacturer. (Id. at p. 1498.) Shersher is of no help to plaintiffs, because the question is not whether they can assert a claim for restitution as indirect purchasers but whether such a claim is viable where they suffered no monetary loss.
(19) The focus of the UCL law is restitution. It is not punishment. "[I]n the absence of a measurable loss [the UCL] does not allow the imposition of a monetary sanction merely to achieve [a] deterrent effect." (Day v. AT & T Corp. (1998) 63 Cal.App.4th 325, 339 [74 Cal.Rptr.2d 55].) Or, in the words of the Supreme Court in Korea Supply, supra, 29 Cal.4th at p. 1148, "A court cannot, under the equitable powers of [the UCL], award whatever form of monetary relief it believes might deter unfair practices."[18]
(20) Having decided that plaintiffs could not be awarded restitution, we need not analyze in detail the standing issue. We briefly observe that in 2004 Proposition 64 amended section 17204 to limit standing for UCL claims to "any person ... `who has suffered injury in fact and has lost money or property as a result of such unfair competition.'" (Californians for Disability Rights v. Mervyn's, LLC (2006) 39 Cal.4th 223, 228 [46 Cal.Rptr.3d 57, 138 P.3d 207]; see Madrid, supra, 130 Cal.App.4th at p. 445, fn. 1.) In other words, the California electorate voted to eliminate UCL representative actions brought on behalf of the general public where a plaintiff has not suffered a loss of money or property. (Californians for Disability Rights v. Mervyn's, LLC, supra, 39 Cal.4th at p. 228.)
Plaintiffs' position herethat they can bring what amounts to a representative action and keep for themselves any potential recovery despite the fact they suffered no monetary lossflies in the face of the intent of Proposition 64. (See Hall v. Time Inc. (2008) 158 Cal.App.4th 847, 853 [70 Cal.Rptr.3d 466] ["The voters' intent in passing Proposition 64 and enacting the changes to the standing rules in Business and Professions Code section 17204 was unequivocally to narrow the category of persons who could sue businesses under the UCL."].)

*248 DISPOSITION
The summary judgment for defendants is affirmed.
Kline, P. J., and Haerle, J., concurred.
NOTES
[1] All statutory references are to the Business and Professions Code unless otherwise noted.
[2] Plaintiffs are James Clayworth, R.Ph., an individual, doing business as Clayworth Pharmacy and Clayworth Healthcare; Marin Apothecaries, Inc., doing business as Ross Valley Pharmacy; Golden Gate Pharmacy Services, Inc., doing business as Golden Gate Pharmacy; Pediatric Care Pharmacy, Inc.; Chimes Pharmacy, Inc.; Mark Horne, R.Ph., an individual, doing business as Burton's Pharmacy; Meyers Pharmacy, Inc.; Benson Toy, R.Ph., an individual, doing business as Marin Medical Pharmacy; Seventeen Fifty Medical Center Pharmacy, Inc.; Tony Mavrantonis, R.Ph., an individual, doing business as Jack's Drug; Julian Potashnick, R.Ph., an individual, doing business as Leo's Pharmacies; Jerry Shapiro, R.Ph., an individual, doing business as a Uptown Drug, Co.; Tilley Apothecaries, Inc., doing business as Zweber's Apothecary; RP Healthcare, Inc.; Rohnert Park Drugs, Inc.; and JGS Pharmacies, Inc., doing business as Dollar Drugs.
[3] Defendants are Abbott Laboratories; AstraZeneca LP; Novartis Pharmaceuticals Corp.; Allergan, Inc.; Boehringer Ingelheim Pharmaceuticals, Inc.; Eli Lilly & Company; Johnson & Johnson; Janssen Pharmaceutical, Inc.; Ortho McNeil Pharmaceutical, Inc.; Ortho Biotech, Inc.; GlaxoSmithKline; Pfizer, Inc.; Hoffman-LaRoche; Aventis Pharmaceuticals, Inc.; Amgen, Inc.; Purdue Pharma L.P.; Merck & Co., Inc.; Bristol-Myers-Squibb Company; Wyeth; Johnson & Johnson Health Care Systems Inc., which apparently does not manufacture, market, or distribute pharmaceutical products; and Pharmaceutical Research and Manufacturers of America, a United States-based nonprofit trade association.
[4] In the separate statement of undisputed facts in support of their cross-motion, defendants stated as fact No. 7, "Plaintiffs have expressly waived any claims for damages not based on the alleged overcharge, including lost sales and diminished business damages." Plaintiffs responded, "Undisputed as written, though immaterial and irrelevant. Plaintiffs have waived their right to collect money damages on lost profits. Plaintiffs' damages are the full extent of the overcharge paid by [p]laintiffsno more or less. However, [p]laintiffs have never stated they were not `damaged in fact' by [d]efendants' overcharge, which put them at a competitive disadvantages vis-à-vis other pharmacies; they simply choose not to collect monies owed them for lost profits."
[5] Plaintiffs also sought summary adjudication on other affirmative defenses. These were not ruled on below, and are not at issue here.
[6] This motion assumed arguendo that defendants did in fact engage in price fixing. At the same time, defendants filed a motion for summary judgment on the merits of plaintiffs' claims, which motion was pending at the time the motions at issue here were decided.
[7] Plaintiffs also filed a request for judicial notice in this court, asking us to take notice of two items from the litigation in the United States District Court in In re TFT-LCD (Flat Panel) Antitrust Litigation (N.D.Cal., May 27, 2008, No. M-07-1827-SI) 2008 U.S.Dist. Lexis 54724): (1) the amicus curiae brief of the State of California filed by the Attorney General, and (2) request for judicial notice filed by the Attorney General. We granted the request at oral argument.
[8] Section 4 of the Clayton Act provides in pertinent part, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained...." (15 U.S.C. § 15.)
[9] On behalf of the State of California, the Attorney General filed an amicus curiae brief in Illinois Brick, arguing in support of standing for indirect purchasers. The brief argued first that the defendants were improperly attempting to assert a pass-on defense that had already been rejected in Hanover Shoe. Alternatively, it argued that the facts of the case "would fall within the exception recognized in Hanover Shoe in any case."
[10] In the 40 years since Hanover Shoe, the Legislature has amended the Cartwright Act six times: Statutes 1969, chapter 1234, page 2395; Statutes 1972, chapter 1140, page 2207; Statutes 1977, chapter 540, page 1741; Statutes 1978, chapter 536, page 1693; Statutes 1983. chapter 1069, page 3772; and Statutes 1987, chapter 865, page 2742.
[11] One Supreme Court case, Union Carbide Corp. v. Superior Court (1984) 36 Cal.3d 15 [201 Cal.Rptr. 580, 679 P.2d 14] (Union Carbide), mentions Hanover Shoe, but only in the dissenting opinion (id. at p. 26 (dis. opn. of Richardson, J.)). We ourselves discussed Hanover Shoe in Crown Oil Corp. v. Superior Court (1986) 177 Cal.App.3d 604, 608-609 [223 Cal.Rptr. 164], where the issue was whether the 1978 amendment to the Cartwright Act was preempted by federal law.
[12] While these cases say what they say, in both cases the Court of Appeal went on to decertify classes of antitrust plaintiffs on the grounds that their injuries could not be presumed on a classwide basis because some "members of the proposed class used loss mitigation techniques, such as ... passing on any inflated prices in subsequent resales." (J. P. Morgan & Co., Inc. v. Superior Court, supra, 113 Cal.App.4th at p. 218; Global Minerals & Metals Corp. v. Superior Court, supra, 113 Cal.App.4th at p. 857.) As the court put it, such evidence "may support a pass-on defense," further noting that the case was not one "in which classwide proof of illegality and impact [i.e., injury] could readily be proved...." (J. P. Morgan, at p. 218; Global Minerals, at p. 857.)
[13] This same point is in the general definition of damages, in Civil Code section 3281, which provides as follows: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages." And Civil Code section 3282 in turn defines "detriment" to mean "a loss or harm suffered in person or property." As defendants correctly explain, "Overcharges that have already been fully recoveredthe only damages alleged in this caseclearly cause no detriment and cannot be recovered again through the award of damages."
[14] "`"Parens patriae," literally "parent of the country," refers traditionally to [the] role of [the] state as sovereign and guardian of persons under legal disability [¶] ... [¶] State attorney generals [sic] have parens patriae authority to bring actions on behalf of state residents for anti-trust offenses and to recover on their behalf.'" (Pacific Gas & Electric, supra, 16 Cal.4th at p. 1148, fn. 6, quoting Black's Law Diet. (6th ed. 1990) p. 1114, col. 1.)
[15] In Liquid Asphalt, the Ninth Circuit endorsed the use of the offensive pass-on theory, setting forth mechanisms available to deal with the problem of multiple liability should such a situation arise. (Liquid Asphalt, supra, 487 F.2d at pp. 197, 201.)
[16] The California parens patriae provision permits the Attorney General or the district attorney of any county to bring a civil action in the name of the people of the State of California or the residents of the county, respectively, for treble damages arising from violations of the Cartwright Act. (§ 16760, subds. (a), (g).)
[17] The cited paragraph includes this quotation, with the italics as supplied by plaintiffs: "`Moreover, the fact of purchasers intermediate between plaintiffs and direct purchasers in the chain of distribution, even if assumed, would not establish a substantial risk of multiple liability. There is no showing of any actual assertion of a Cartwright Act claim on behalf of any such intermediate purchaser. We turn again to the views expressed by the Illinois Brick dissenting opinion that seem to have met with the California Legislature's approval when it amended section 16750, subdivision (a), in 1978 (See Union Carbide, supra, 36 Cal.3d at pp. 23-24.)
[18] Plaintiffs' UCL claim also prays for injunctive relief, though their brief does not address the point. The same rationale that applies to the restitution analysis would preclude any right to any action for injunction, which can be brought only by prosecutors or by a person "who has suffered injury in fact and has lost money or property." (§ 17204.)